# United States Court of Appeals
## For the First Circuit

No. 03-1795

UNITED STATES OF AMERICA,

Appellee,

v.

OSVALDO CARABALLO-RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Michael R. Hasse, by appointment of the court, for appellant.
Mariana E. Bauzá-Almonte, Assistant United States Attorney,
with whom Rosa Emilia Rodriguez-Velez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, were on brief,
for appellee.

March 21, 2006

**LYNCH**, **Circuit Judge**.  Former Puerto Rico police officer Osvaldo Caraballo-Rodríguez (Caraballo) seeks on appeal to withdraw his plea of guilty to the crime of misprision of felony, 18 U.S.C. § 4.  The plea was entered as part of a plea bargain under which much more serious drug conspiracy charges were dismissed.  In order to withdraw his plea, Caraballo must, as he admits, meet the plain error standard of showing that, on the facts charged, no crime of misprision could be stated, that this error was plain at the time, that his substantial rights were affected (including that he would otherwise not have entered the plea agreement), and that the error implicated the fairness, integrity, or public reputation of judicial proceedings.  This is a daunting task, and Caraballo does not accomplish it.

The prosecution's allegations were that Caraballo committed misprision by concealing and failing to report an underlying drug crime in which he was involved (1) when he gave accurate information in an anonymous tip to the Drug Enforcement Administration (DEA) about the crime, but refused to provide additional requested information, and (2) when he refused to provide additional information despite his duty as a Puerto Rico police officer to disclose crimes.

Caraballo makes a serious argument that this court should adopt an interpretation of the misprision statute, as many circuits have done, which requires that there be an affirmative act of

concealment, and hold that the facts in this case cannot sustain such a conviction. We do not rule on that question because even if there were error, it is not plain, and Caraballo has not shown either that his substantial rights were affected or that entry of this plea undermined the integrity of the proceedings or constituted a miscarriage of justice.

I.

In a sting investigation in 2000-2001 named "Honor Perdido" or "Lost Honor," the FBI uncovered, and then the United States successfully prosecuted, a number of corrupt Puerto Rican police officers who assisted in the transportation and protection of illegal drugs in exchange for money. See United States v. Sánchez-Berríos, 424 F.3d 65, 71-72 (1st Cir. 2005); United States v. Villafane Jimenez, 410 F.3d 74, 78 (1st Cir. 2005); United States v. Vázquez Guadalupe, 407 F.3d 492, 494 (1st Cir. 2005); United States v. Flecha-Maldonado, 373 F.3d 170, 172-73 (1st Cir. 2004).

One of the officers netted was Caraballo. He was indicted and arrested in August 2001 in Cr. No. 01-613 for providing armed protection for a successful drug transport of more than five kilograms of cocaine. A second superseding indictment named sixteen defendants in total, charging Caraballo and others with (1) conspiracy to knowingly and intentionally possess with intent to distribute more than five kilograms of cocaine, in

-3-

violation of 21 U.S.C. § 846; (2) attempt to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846; and (3) aiding and abetting in knowingly carrying firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i). There was also a forfeiture count against all sixteen defendants under 21 U.S.C. § 853.

The second superseding indictment charged that the conspirators "use[d] their official positions as law enforcement officers and . . . use[d] official government vehicles in order to ensure that no law enforcement agency or competing drug organizations would attempt to stop the vehicle in which the cocaine was concealed and seize the same." It also alleged that the defendants "possess[ed] and carr[ied] firearms in order to protect the shipments of multiple kilogram[s] of purported cocaine." If convicted on the drug conspiracy or attempt charge, Caraballo faced a statutory minimum of ten years of imprisonment. 21 U.S.C. §§ 841(b)(1)(A), 846. Defendant faced at least an additional five years if convicted of the firearms charge. 18 U.S.C. § 924(c)(1)(A)(i).

Although Caraballo agreed to help protect a drug transport, he took some unusual steps. He first partially tipped the DEA to the existence of the drug conspiracy. He then personally participated in the conspiracy. And he later met with the DEA to offer information and confess. Specifically, on May 24,

-4-

the day before he assisted with the transfer of some ten kilograms of what was purported to be cocaine, he placed an anonymous call to the DEA. Caraballo indicated that he had information about police officers involved in drug trafficking, and stated that he had been approached by a female officer about participating in a drug smuggling operation. On questioning from DEA agents, he refused to give information that might identify himself or his co-conspirators, or to furnish specific information about the plot. He withheld information he knew about the drug transport that might have enabled the federal agents to interrupt the conspiracy. In truth, since this was a sting operation, the DEA had no desire to interrupt the conspiracy.

Close to two weeks after participating in the May 25 drug transport, on June 8, Caraballo contacted the DEA again, indicating that he wanted to provide information about police corruption and drug trafficking. Later that day, Caraballo met with two federal agents and described the transport of drugs that took place two weeks earlier. Caraballo provided names of co-conspirators, admitted his own participation in the drug transport, and stated that he received $4,000 for his efforts. Caraballo agreed to cooperate with the FBI. The record does not establish whether he made full disclosure. It is clear that his later disclosure to authorities was not made as soon as possible after he had knowledge

of the crime. Despite his cooperation in June, Caraballo was still indicted in August.

After he was charged, Caraballo, represented by counsel, negotiated a plea agreement with the prosecution. He received a number of benefits. The government agreed to a new charge, brought under 18 U.S.C. § 4, of misprision of felony, to which Caraballo agreed to waive indictment and plead guilty. This was a considerably less significant charge than the drug conspiracy, attempt, and firearms charges.

There was another benefit to Caraballo as well. For the limited purpose of the plea agreement, the parties stipulated that Caraballo would be held accountable for having knowledge of, and concealing, the underlying felony of conspiracy to distribute at least 400 grams but less than 500 grams of cocaine. Under the earlier drug conspiracy indictment, Caraballo had been charged with being accountable for more than five kilograms of cocaine, not a mere 400 to 500 grams.

And there were other benefits to Caraballo. The parties also agreed that they would jointly recommend a sentence of imprisonment equivalent to the time Caraballo spent in pre-trial detention. Upon imposition of sentence, the United States agreed to move to dismiss the charges pending against defendant in Cr. No. 01-613. The agreement, signed on December 4, 2002 by Caraballo, who was represented by counsel, acknowledged that "he is pleading

guilty freely and voluntarily because he is in fact guilty [of the crime of misprision]."

II.

The misprision information, filed in Cr. No. 02-463 on the same day that defendant signed the plea agreement, alleged that Caraballo had knowledge of a conspiracy to distribute cocaine but "did conceal the same by withholding information and the identities of conspirators in communications with federal law enforcement agents, and did not as soon as possible make known the conspiracy to some . . . authority." On the misprision charge, Caraballo's maximum term of imprisonment was three years, his maximum fine was $250,000, and the maximum term of supervised release was one year.

The plea agreement contained a signed stipulation of facts, as follows:

> 1. In November 2000, Arturo Ortiz-Colon, a former police officer cooperating with government investigators, told DIANA DIAZ-CRISPIN, then a police officer of the Puerto Rico Police Department, that a Colombian drug trafficker referred to as "El Viejo" sought to hire police officers to escort and protect multiple kilogram shipments of cocaine. DIANA DIAZ-CRISPIN agreed to escort and protect the cocaine shipments, and additionally agreed to recruit other police officers to escort shipments of cocaine.
>
> 2. In May 2001, . . . DIANA DIAZ-CRISPIN invited OSVALDO CARABALLO-RODRIGUEZ to assist in [the] transportation and protection of a cocaine shipment. DIANA DIAZ-CRISPIN and Arturo Ortiz Colon informed OSVALDO CARABALLO-RODRIGUEZ of the plan to escort a shipment of cocaine.

-7-

3. Although a police officer, OSVALDO CARABALLO-RODRIGUEZ did not timely report the conspiracy to distribute cocaine to other police officers. Although OSVALDO CARABALLO-RODRIGUEZ spoke with agents of the Drug Enforcement Administration prior to the transport of the purported cocaine, he did so anonymously and withheld information that might have enabled the federal agents to interrupt the conspiracy. More specifically, when agents asked OSVALDO CARABALLO-RODRIGUEZ for information regarding the conspiracy, OSVALDO CARABALLO-RODRIGUEZ at that time declined to identify the conspirators or to furnish specific information regarding their plot.

4. On May 25, 2001, DIANA DIAZ-CRISPIN and other members of her conspiracy successfully transported packages purported to contain cocaine from one point to another point in Puerto Rico.

With Caraballo's consent, his plea was entered on December 4, 2004 before a magistrate judge who followed the usual procedural requirements under Federal Rule of Criminal Procedure 11. During the colloquy, the following exchange took place:

THE COURT: And the charge says, generally, that you concealed the same by withholding information and the identities of the conspirators in communications with federal law enforcement agents and you did not as soon as possible make known the conspiracy to some Judge or other person in a civil or a military authority under the United States.

Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: And that's the charge that you're pleading guilty to, is that correct?

THE WITNESS: Yes, sir.

-8-

There is no doubt that the government made explicit its theory of what constituted both the underlying felony and the misprision charge.

As for the factual basis for the plea, the government began its recitation of the facts at the plea hearing by noting that "the evidence to prove the information in this case is closely tied to the evidence in Criminal Case 0[1]-0613,"[1] which was before the same district judge. The government continued:

> [I]f we'd gone to trial the United States would have presented testimony and audio and video recordings to show that in November of 2000 a cooperating witness by the name of Arturo Ortiz Colon contacted a police officer, Diana Diaz Crispin, and offered her a job on behalf of the Colombian drug trafficker known as "El Viejo[,"] escorting and protecting cocaine shipments.
>
> Diana Diaz agreed to do this and also agreed to recruit other police officers.
>
> In May 2001 Diana Diaz Crispin invited this Defendant Osvaldo Caraballo Rodriguez to assist in the transportation and protection of the cocaine shipment.
>
> She further informed this Defendant, as well as Arturo Ortiz Colon informing this Defendant, as well as the details of the plan to escort a shipment of the cocaine.
>
> Although he was a police officer at the time[,] this Defendant did not timely report this conspiracy to any other police officers or the Puerto Rico Police Department.

---

[1]Although the prosecutor cited Cr. No. 00-0613, it is clear that he meant to refer to Cr. No. 01-613.

What's more, although he spoke with the agents of the Drug Enforcement Administration prior to the transport of the purported cocaine, that is on May 24, he did so anonymously and with no information that would have enabled the federal agents to interrupt the conspiracy.

Specifically, when the agents asked him for information regarding the conspiracy that might identify the Defendant or his co-conspirators or the conspirators in the case[,] he declined to furnish the specific information regarding the plot at that time.

Thus, [o]n May 25, 2001 Diana Diaz Crispin and other members of the conspiracy successfully transported packages purported to contain cocaine from one point to another in Puerto Rico.

Notably, the prosecutor referred to "Defendant or his co-conspirators," making clear that the government believed it had evidence to prove beyond a reasonable doubt that Caraballo had at some point joined the conspiracy. The prosecutor also stated that the drug conspirators successfully transported packages purported to contain cocaine from one point to another in Puerto Rico. Caraballo agreed with this recitation of the facts:

THE COURT: Mr. Caraballo, did you listen to what the Prosecutor said?

THE WITNESS: Yes, sir.

THE COURT: Do you agree with his statement?

THE WITNESS: Yes, sir.

THE COURT: Is there anything in that statement that you disagree with?

THE WITNESS: No, sir.

-10-

THE COURT: Do you still wish to plead guilty?

THE WITNESS: Yes, sir.

The transcript of the plea hearing makes clear that, as to the underlying drug conspiracy, Caraballo agreed that he had been a conspirator.[2]

---

[2]Caraballo has moved to strike the government's supplemental appendix, which contains FBI interview notes relating to Caraballo's participation in the underlying drug offense. The notes contain admissions from Caraballo that he participated in the conspiracy. Since he already agreed with the prosecutor's recitation of facts at the plea colloquy, it is unclear what the motion to strike on appeal is intended to accomplish.

Caraballo wrongly argues that the papers are outside of the record because they appeared first in the record of the underlying drug case, Cr. No. 01-613. Under Federal Rule of Appellate Procedure 10(a)(1), the record consists of "the original papers and exhibits filed in the district court." But the interview notes were also on file in this misprision case. The notes independently appear in the file for this case, stapled to Caraballo's plea agreement, and thus they appear to have been filed in Cr. No. 02-463 under docket number 3. Indeed, that docket entry is described by the district court as "Plea Agreement with government's version of the facts attached." The record in this case as transmitted by the district court on appeal did in fact contain the documents, contrary to the dissent. Further, Caraballo himself submitted these same interview notes to this court in a pro se brief he filed in this case.

Even if the notes had not been filed in Cr. No. 02-463, the notes were clearly filed in the related proceeding, Cr. No. 01-613, and both cases proceeded before the same district judge. That means that the district judge who accepted Caraballo's guilty plea and sentenced him had these interview notes in the case files. The cases are so intertwined that the sentencing transcript in Cr. No. 02-463 contains the government's formal dismissal of all charges in Cr. No. 01-613. Accordingly, even if the interview notes had only been filed in Cr. No. 01-613, we would deem them as within the scope of Rule 10. Cf. United States v. Canada, 960 F.2d 263, 267-68 (1st Cir. 1992) (holding that sentencing court may rely on information derived from a co-defendant's trial before the same judge).

Further, the district court has now supplemented the record and certified that the interview notes are part of the record on

The magistrate judge found defendant's plea to the misprision charge to be knowing and voluntary, accepted the plea, and made a report and recommendation to the district court on December 6, 2002. Caraballo filed no objection with the district court.

On April 30, 2003, Caraballo appeared before the district court for sentencing. The court accepted the parties' recommendation and imposed a sentence of time served. Caraballo was arrested on August 14, 2001 and remained in prison until December 4, 2002, when he was released on his personal recognizance. No fine was imposed beyond the required special monetary assessment of $100.

On May 6, 2003, Caraballo appealed from the judgment of conviction and his sentence. His appellate counsel initially filed an Anders brief, which this court rejected. See Anders v. California, 386 U.S. 738, 744 (1967). We directed counsel to brief the issue of whether there was a factual basis for Caraballo's plea as to each element of the offense charged under 18 U.S.C. § 4, and

---

this appeal. The clerk of the district court certified that the transmitted documents "constitute the supplemental record on appeal in the case," clearly referring to Cr. No. 02-463.

Caraballo's other ground for striking the appendix is that the interview notes are not admissible under the rules of evidence. But there is no requirement, under Federal Rule of Appellate Procedure 10, that a document must be admissible in evidence to be part of the record on appeal. Nor is a sentencing court bound by the rules of evidence. United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005).

-12-

in particular whether a failure to make full disclosure constitutes an act of concealment under the misprision statute. We directed counsel's attention to United States v. Cefalu, 85 F.3d 964 (2d Cir. 1996); United States v. Walters, 885 F.2d 1266, 1274 (5th Cir. 1989); and United States v. Ciambrone, 750 F.2d 1416, 1418 (9th Cir. 1985). On the further submission of an Anders brief, we permitted Caraballo's counsel to withdraw and appointed new counsel, who has briefed this appeal.[3]

### III.

The essence of Caraballo's claim is that he pled guilty to activities which do not constitute the crime of misprision and so his plea must be vacated. See United States v. Johnson, 546 F.2d 1225, 1227 (5th Cir. 1977) (reversing conviction under 18 U.S.C. § 4 by guilty plea on preserved claim where factual basis for plea showed mere failure to report a felony and court held this did not constitute misprision). He also characterizes the district court as having affirmatively misstated an element of the offense at the plea colloquy in violation of Federal Rule of Criminal

---

[3]Counsel was required to consult with his client on whether Caraballo wished to pursue an appeal which, if successful, might lead to the government's reinstituting the conspiracy, attempt, firearms, and criminal forfeiture charges against Caraballo. Counsel has done so, and Caraballo has chosen to go forward.

Procedure 11.  See United States v. Gandia-Maysonet, 227 F.3d 1, 3-5 (1st Cir. 2000).[4]

Rule 11 requires a court to determine that there is a factual basis for a plea before entering judgment.  Fed. R. Crim. P. 11(b)(3).  Rule 11 also requires a court to ensure that a defendant understands the nature of each charge to which he pleads guilty.  Fed. R. Crim. P. 11(b)(1)(G).  There was certainly a factual basis for the plea on the government's theory.  The question is rather whether the government's theory, which was explained to Caraballo at the plea colloquy, permissibly stated an offense under 18 U.S.C. § 4.

A.          Standard of Review

Caraballo failed to call the district court's attention to the alleged lack of a factual basis for the plea, or to present to the district court the legal arguments now asserted.  Caraballo also never moved to withdraw his plea.

As a result, our review is for plain error.  United States v. Vonn, 535 U.S. 55, 58-59 (2002); United States v. Negrón-Narváez, 403 F.3d 33, 37 (1st Cir. 2005).[5]  "To establish plain

_____

[4]Further, Caraballo attempts to color his claim as raising constitutional due process concerns.

[5]To the extent defendant argues that the asserted error involves structural error, invoking a more demanding standard of review, we reject any such claim.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (explaining that structural error involves a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process

-14-

error, a defendant must demonstrate that: (1) there was error; (2) the error was plain; (3) the error affected the defendant's substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings." United States v. Riggs, 287 F.3d 221, 224 (1st Cir. 2002) (citing United States v. Olano, 507 U.S. 725, 732-36 (1993); United States v. Saxena, 229 F.3d 1, 5 (1st Cir. 2000)); see also United States v. Ramirez-Benitez, 292 F.3d 22, 27 (1st Cir. 2002). The burden is on the defendant to establish each element of plain error.

In applying plain error analysis in guilty plea cases, a defendant must, in order to demonstrate that his substantial rights were affected, "show a reasonable probability that, but for the error, he would not have entered the [guilty] plea." United States v. Dominguez Benitez, 542 U.S. 74, 83 (2004); see also United States v. Delgado-Hernandez, 420 F.3d 16, 20 (1st Cir. 2005) (applying plain error analysis where defendant argued there was no factual basis to support his guilty plea). "A defendant must thus satisfy the judgment of the reviewing court, informed by the entire

---

itself"); United States v. Padilla, 415 F.3d 211, 219 (1st Cir. 2005) (en banc) (noting that "[t]he category of structural error has been reserved for a very limited class of cases" involving "only the most pervasive and debilitating errors," such as "a total withholding of the right to counsel at trial," "a denial of the right of self-representation at trial," or "the specter of a biased judge presiding over a case" (citations and internal quotation marks omitted)). Here, defendant has not alleged an error affecting the "entire conduct of the trial from beginning to end." Fulminante, 499 U.S. at 309.

-15-

record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." Dominquez Benitez, 542 U.S. at 83 (internal quotation marks omitted).

B.        Misprision of Felony -- Was There Plain Error?

The prosecution has articulated the elements of the offense as follows:

> In the instant case, the offense of conviction, misprision of felony, requires proof that: "1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime."

See Cefalu, 85 F.3d at 969 (citing Ciambrone, 750 F.2d at 1417; United States v. Baez, 732 F.2d 780, 782 (10th Cir. 1984)). Caraballo has not materially contested this formulation, and we accept it arguendo.

This is an unusual case in that Caraballo had several overlapping roles. First, he had full knowledge, both before and after, of a crime. Second, he was a participant in that crime and not a mere witness. Third, although he did initially notify authorities, he did not provide authorities with his full knowledge of the drug conspiracy despite requests that he do so. Fourth, he was not a mere member of the public but was a police officer. Each of these roles factors into the analysis.

Applying the plain error test, we ask whether Caraballo's proposed construction -- that a partial truthful disclosure cannot

-16-

be an affirmative act and an affirmative act is required -- is compelled by the language of the statute itself, construction of the statute in light of the common law, or <u>binding</u> judicial construction of the statute. We hold that Caraballo has not met his burden of showing there was an error which was plain, for several basic reasons. In doing so, we do not make any ruling on the merits of the issues discussed under the misprision statute.

First, while this court and the Supreme Court may someday adopt the majority rule in the circuits that an affirmative act is required for a misprision offense, there is now no binding precedent to that effect. Caraballo does not argue otherwise. None of our misprision cases has adopted Caraballo's proposed rule. Further, in <u>United States</u> v. <u>Vazquez-Alomar</u>, 342 F.3d 1, 2 (1st Cir. 2003), we suggested that a federal prisoner had violated 18 U.S.C. § 4 when he did not inform federal authorities that he had engaged in telephone conversations with others about crimes. Consequently, there can be no plain error. Thus, we need not resolve the greyer areas of what constitutes an affirmative act. Secondly, we cannot say there is plain error because the government articulates a new theory, not accepted, but not rejected by any court, based on Caraballo's obligations as a police officer. The theory has some support at English common law.

Caraballo's argument that there was plain error is not proven by the language of the statute itself. Misprision of felony is defined at 18 U.S.C. § 4:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

The underlying felony in this case was the drug conspiracy charged in Cr. No. 01-613. At issue is whether the facts alleged satisfy the statutory terms "conceals and does not as soon as possible make known."

The dictionary definitions of "conceal" and "concealment" do not prove Caraballo's claim. The Oxford English Dictionary refers to both a common usage of keeping secret of any information and a legal usage of intentional suppression of truth. 3 Oxford English Dictionary 647 (2d ed. 1989). Black's Law Dictionary defines the primary meaning of "concealment" as "[t]he act of refraining from disclosure[, especially] an act by which one prevents or hinders the discovery of something." Black's Law Dictionary 306 (8th ed. 2004). Neither source compels only one reading of the term "conceals" in 18 U.S.C. § 4.

Nor does the common law background of the statute compel Caraballo's reading. The statute at issue derives from a common law offense. Misprision of felony was a crime under English common

-18-

law, dating back centuries.  <u>Sykes</u> v. <u>Dir. Pub. Prosecutions</u>,
[1962] A.C. 528, 555 (H.L.) (U.K.) (stating that misprision of
felony "has been an offence for the last 700 years or more," though
not always under that name); C.W. Mullis, Comment, <u>Misprision of
Felony: A Reappraisal</u>, 23 Emory L.J. 1095, 1095 (1974) (noting that
"[t]he offense of failing to report a felony was first labeled
'misprision' by Sir William Staun[]ford in 1557").

Congress, in 1790, enacted a federal misprision statute
which is essentially the same as 18 U.S.C. § 4 today.  <u>See</u> Act of
Apr. 30, 1790, § 6, 1 Stat. 113.  There are some differences,
however, between the English common law doctrine and how the
federal statute has been interpreted in the United States.  <u>See</u>
C.M. Curenton, Comment, <u>The Past, Present, and Future of 18 U.S.C.
§ 4: An Exploration of the Federal Misprision of Felony Statute</u>, 55
Ala. L. Rev. 183, 183-84, 186 (2003); Mullis, <u>supra</u>, at 1098-99,
1101-04.

At English common law, "[e]ver since the days of hue and
cry, it [was] the duty of a man, who kn[ew] that a felony ha[d]
been committed, to report it to the proper authority so that steps
[could] be taken to apprehend the felon and bring him to justice."
<u>Sykes</u>, [1962] A.C. at 555.  Accordingly, Staunford in 1557 defined
misprision as follows: "Misprision . . . is properly when anyone
learns or knows that another has committed treason or felony, and
he does not choose to denounce him to the King or to his Council,

-19-

or to any magistrate, but conceals his offense." Id. at 557. In light of this history, Lord Denning of the House of Lords pronounced that a person accused of misprision of felony "need not have done anything active: but it is his duty by law to disclose to proper authority all material facts known to him relative to the offence." Id. at 563. Lord Guest, for his part, observed that he could not find in the "numerous institutional writers who have defined [misprision of felony] . . . any statement that active steps of concealment are required to constitute the offence." Id. at 572.

Nor has the Supreme Court adopted Caraballo's reading. The Court, in Roberts v. United States, 445 U.S. 552 (1980),[6] discussed the obligations of citizens not to conceal crimes, first as a matter of common law and then as defined and enforced through 18 U.S.C. § 4. As Roberts stated:

> Concealment of crime has been condemned throughout our history. The citizen's duty to "raise the 'hue and cry' and report felonies to the authorities," Branzburg v. Hayes, 408 U.S. 665, 696 (1972), was an established tenet of Anglo-Saxon law at least as early as the 13th century. 2 W. Holdsworth, History of

---

[6]Roberts dealt with the analogous question of whether a sentencing court could take into account the fact that a defendant only partially cooperated with the police investigation. The defendant provided information about drug transactions and explained the meaning of certain code words, but gave evasive answers when asked to name suppliers. 445 U.S. at 554. Roberts, in a pre-guidelines era, held that the judge could properly take the defendant's lack of full cooperation into account at sentencing. Id. at 561-62.

-20-

English Law 101-102 (3d ed. 1927); 4 id., at 521-522; see Statute of Westminster First, 3 Edw. 1, ch. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, chs. 1, 4, and 6, pp. 112-115 (1285). The first Congress of the United States exacted a statute imposing criminal penalties upon anyone who, "having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority . . . ." Act of Apr. 30, 1790, § 6, 1 Stat. 113. Although the term "misprision of felony" now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.

445 U.S. at 557-58 (alterations in original) (footnote omitted).

Roberts made explicit that 18 U.S.C. § 4 can be applied where, as here, the witness to the crime is a participant himself in the underlying criminal activities, subject to Fifth Amendment concerns[7]:

---

[7]Where the person with knowledge of an underlying crime is also involved in the crime, there are tensions between the Fifth Amendment privilege against self-incrimination and the statutory obligation to provide disclosure. See, e.g., United States v. King, 402 F.2d 694, 697 (9th Cir. 1968); see also United States v. Kuh, 541 F.2d 672, 677 (7th Cir. 1976) ("If the duty to notify federal authorities is precluded by constitutional privilege, it is difficult to understand how a conviction [under 18 U.S.C. § 4] could be substantiated."). But see United States v. Daddano, 432 F.2d 1119, 1125, 1129 (7th Cir. 1970) (discussing argument that the misprision statute could not be applied to defendants because of Fifth Amendment privilege, but ultimately affirming convictions). Caraballo has not argued there are any Fifth Amendment privilege issues in this appeal. Caraballo has not established that he was entitled to assert any Fifth Amendment privilege at the time of his initial tip. The record established only that he knew of the conspiracy, and does not establish that he had in fact agreed to participate in the conspiracy. He waived any privilege as of the time he disclosed to the police after he participated in the crime. Nor does Caraballo argue that the Fifth Amendment shielded him from

>This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself. Unless his silence is protected by the privilege against self-incrimination . . ., the criminal defendant no less than any other citizen is obliged to assist the authorities.

Id. at 558. Putting constitutional concerns aside momentarily, the statutory text applies to "whoever" meets its criteria, and does not necessarily exclude participants in crimes.[8]

Still, in Caraballo's favor is the fact that neither the common law crime nor the statute was meant to punish in every instance every person who knows of a crime but does not report it. In 1822, Chief Justice Marshall noted, "It may be the duty of a citizen to accuse every offender, and to proclaim every offense which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man." Marbury v. Brooks, 20 U.S. (7 Wheat.) 556, 575-76 (1822). Further,

---

application of the statute.

The privilege may be waived, as Caraballo has done, thus permitting plea bargains of this sort.

It may also be that the statute is curtailed by common law privileges, such as the attorney-client privilege or spousal immunity. See Mullis, supra, at 1099, 1110; see also Sykes, [1962] A.C. at 564 (dismissing claim that "the offence of misprision is impossibly wide," reasoning that "[n]on-disclosure may sometimes be justified or excused on the ground of privilege," such as that between attorneys and clients or between doctors and patients). None of those common law privileges is involved here.

[8]In Branzburg v. Hayes, 408 U.S. 665, 696 n.36 (1972), the Supreme Court also noted that some lower courts had construed the statute to require both knowledge of a crime and an affirmative act of concealment or participation, but the Court did not adopt that construction.

it is clear that misprision of felony cannot be read so broadly as to "make a criminal of anyone who, as the victim of a crime or faced with a criminal threat, resisted a . . . suggestion that the police be called." United States v. Rakes, 136 F.3d 1, 5 (1st Cir. 1998). The scope of the obligations imposed by the statute is an important issue in today's society where police investigations are often hampered by codes of silence and fearful refusal by witnesses to cooperate. Those issues are beyond the scope of this opinion.

Rather, Caraballo's argument turns on judicial construction of the statute; since we have not yet adopted the construction he urges, there is no plain error. However, we do not foreclose later adoption of such a construction. Caraballo particularly stresses the fact that many courts have interpreted the "conceals and does not as soon as possible make known" language as requiring an affirmative act of concealment. See, e.g., United States v. Goldberg, 862 F.2d 101, 104 (6th Cir. 1988); United States v. Davila, 698 F.2d 715, 717 (5th Cir. 1983); United States v. Sampol, 636 F.2d 621, 653 (D.C. Cir. 1980); Daddano, 432 F.2d at 1124; Lancey v. United States, 356 F.2d 407, 410 (9th Cir. 1966); Neal v. United States, 102 F.2d 643, 646 (8th Cir. 1939); Bratton v. United States, 73 F.2d 795, 797-98 (10th Cir. 1934) (citing United States v. Farrar, 38 F.2d 515, 517 (D. Mass), aff'd on different grounds, 281 U.S. 624 (1930)).

Whether it is a proper construction of the statute to require an affirmative act of concealment has been questioned. Mullis, supra, at 1104 ("The possibility that such a requirement was originally intended by Congress is rather slim, since, by the date of the statute's first enactment [in 1790], such a requirement had never before been applied to the crime. It is much more reasonable to conclude that Congress intended 'conceal and' to signify a conscious and intentional non-disclosure.").

Caraballo argues that, in any of his capacities, he did not conceal the drug conspiracy. Rather, he disclosed it, and his refusal to provide the additional requested information cannot be punished as an act of concealment.[9] Caraballo relies on a series of cases holding that mere silence does not qualify as an act of concealment. See Goldberg, 862 F.2d at 105-06; Johnson, 546 F.2d at 1227; Lancey, 356 F.2d at 410; Neal, 102 F.2d at 650; Bratton, 73 F.2d at 798. But mere silence cases do not necessarily help him. Caraballo did not remain merely silent. He affirmatively sought out federal agents to make partial disclosure, but then declined to provide requested information.

Caraballo places special emphasis on Ciambrone, a Ninth Circuit case. Ciambrone is not a mere silence case, but a partial disclosure case. The defendant in Ciambrone truthfully, but only

---

[9]In most cases, it is irrelevant whether the government had other knowledge of the crime, as it apparently did here. Lancey, 356 F.2d at 409-10.

partially, disclosed his knowledge about a counterfeiting operation to a Secret Service agent. 750 F.2d at 1417. The court held that partial disclosure could not constitute misprision because if some information were offered, there could be no greater concealment of the felony than if the defendant who had knowledge of the crime had said nothing. Id. at 1418. Ciambrone required an affirmative act and implicitly held that the act of coming forward to provide information, but refusing to answer other questions, does not qualify as an affirmative act of concealment. None of the other cases cited by Caraballo adopts Ciambrone's position with respect to partial disclosures. Indeed, no federal court has followed Ciambrone in holding that a truthful, but partial, disclosure is insufficient to support a misprision conviction.

The Ciambrone logic, then, departs from the common law position that there is a general duty on citizens to disclose, and instead relies on a more limited rationale for the statute that misprision is concerned only with situations in which the government may be put in a worse situation or misled.

Caraballo admits that courts have sustained the application of the misprision statute in cases where someone with knowledge of a felony provided untruthful information. See Sampol, 636 F.2d at 656; cf. United States v. Salinas, 956 F.2d 80, 81 (5th Cir. 1992). He distinguishes these cases on the facts here, on the

basis that it is not alleged that he provided false information to federal agents.

There may be instances in which even partial truthful disclosures can be misleading. Ciambrone assumes that the government may not be misled by receipt of truthful information, even if it is incomplete, 750 F.2d at 1418, but that is not necessarily so. For example, United States v. Sessions, Nos. 00-1756, 00-1791, 2000 WL 1456903 (8th Cir. Oct. 2, 2000) (unpublished decision), held that the misprision statute was satisfied where the defendant "gave incomplete information to police regarding his knowledge of the [crime]," at least where he "gave the police partial information that was misleading." Id. at *1. If the statute is geared toward avoiding the misleading of police, Ciambrone, 750 F.2d at 1418, it is still possible, in concept and in fact, that even a truthful but partial disclosure could conceal by misleading the government through the withholding of key information.[10]

---

[10]This concept is commonly accepted in other areas of law. See United States v. Nelson-Rodriguez, 319 F.3d 12, 33 (1st Cir. 2003) (recognizing that omitted facts in a wiretap warrant affidavit may mislead); United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996) (commenting that a "bare-bones description" submitted to judge may have been "calculated to mislead"); United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985) (holding that omitted facts in a warrant affidavit may mislead); United States v. Previte, 648 F.2d 73, 85 (1st Cir. 1981) (noting that trial court's use of slide transparencies to deliver jury instructions "had some potential to mislead the jury, more by what they omitted than by what they contained").

We cannot tell from the facts here whether the giving of partial information in this case in any way could have misled the DEA -- the information against Caraballo alleged only that he withheld information and the identities of co-conspirators, and did not as soon as possible make the conspiracy known to the appropriate authorities. On plain error review, even under a modified Ciambrone approach, it is defendant's burden to show that his truthful but partial disclosure was not misleading, and Caraballo has not done so.

The government argues, as a second theory,[11] that even if there is a requirement for an affirmative misrepresentation from an ordinary citizen, Caraballo had higher duties as a police officer. This appears to present a novel interpretation of the statute. The prosecution's theory derives from the obligations on police officers to disclose information about crimes, irrespective of whether civilians would have had such a duty. Caraballo was, at

_____

[11]At oral argument, but not in its brief, the government presented an additional argument -- that the "concealment" consisted of defendant's actions during the underlying drug crime when, by providing a police escort, he tried to make it appear that the transport of the drugs was legitimate. See United States v. Gravitt, 590 F.2d 123, 125-26 (5th Cir. 1979) (defendant transported robbers in his car to where stolen money was stashed and then returned to his apartment where money was divided); see also Lancey, 356 F.2d at 410-11 (defendant either himself concealed or allowed bank robber to conceal numerous items related to robbery). That was not the theory on which the plea was accepted. On the other hand, had Caraballo raised questions before the district court about the legitimacy of the government's misprision theory, the government might have filed a new or amended information raising this alternate theory of concealment.

the time, a police officer who had an affirmative duty to act on information about a crime under Puerto Rican law. See P.R. Laws Ann. tit. 25, § 3102 (duty of the "Puerto Rico Police" is to "prevent, discover, investigate and persecute crime and, within the scope of its authority, enforce obedience of the laws").

The prosecution argues that government officials, particularly police, who are already under an affirmative duty to report crimes, inherently conceal when they do not meet their duty to disclose. We have found no misprision cases discussing this theory.[12]

Nonetheless, the argument, in light of the theory of law under the misprision statute to which Caraballo pled guilty, cannot be said to be plainly erroneous. Roberts itself referred to "gross

---

[12]Of the multiple misprision cases Caraballo cites in his brief, only two involve defendants who were police officers. In neither case, apparently, was this argument made. The defendant in Bratton was a peace officer who apprehended someone feloniously possessing alcohol. 73 F.2d at 796 n.1, 797. The officer released the offender upon a promise of being paid a bribe, most of which was in fact paid. Id. at 796 n.1. The Tenth Circuit, in 1934, reversed the conviction, finding no act of concealment. Id. at 798-99. The court did not, however, consider the import of Bratton's status as an officer. Id.

In Daddano, one of the defendants was the Chief Investigator of the Special Investigations Unit for the county sheriff's department. 432 F.2d at 1122. The Seventh Circuit held that the jury could properly infer from the evidence that the officer had arranged to have lie detector tests administered to a group of bank robbers, at the request of a crime boss. Id. at 1122-23. The court held that the administration of the lie detector tests constituted an affirmative act of concealment. Id. at 1124-25. But, as in Bratton, the court did not consider whether the defendant's occupation as a police officer imposed special duties. Id. at 1123-25.

-28-

indifference to the duty to report" and thought pertinent the development of this duty in Anglo-Saxon law. Indeed, there is some historical support in common law misprision doctrine for imposing special responsibilities on public officials. In 1628, Lord Coke in his Third Institute noted that "the concealment of felonies in sheriffs, or bailiffs of liberties is more severely punished than in others." Sykes, [1962] A.C. at 558 (internal quotation marks omitted). Professor Glazebrook, although arguing for a broader view of what constituted misprision under English common law, has recognized that the term "misprision" in the fourteenth and fifteenth centuries was thought "to have been . . . especially appropriate to the misconduct of public officers." P.R. Glazebrook, Misprision of Felony -- Shadow or Phantom?, 8 Am. J. Legal Hist. 189, 191, 194 (1964). As another commentator has noted, "In fact, a strong case can be made that misprision should have particular applicability to public officers. Even at common law, commission of misprision appears to have been especially culpable for public officers, since they received a higher penalty for the crime than that received by ordinary citizens." Mullis, supra, at 1113 (citing W. Blackstone, 4 Commentaries 121). Because the theory is novel under the statute, it has neither been accepted nor rejected. The burden is on defendant to show that if there was any error, that error was plain. Ramirez-Benitez, 292 F.3d at 27.

This background buttresses our conclusion that if there was any error, it was not plain error. We stress that we do not, and need not, rule on the merits of issues pertaining to the judicial construction of the statute. The analysis could end here, but we comment briefly on the remaining prongs of the test.

C.        Other Elements of Plain Error Test

Under the third prong, we must ask, as Caraballo has framed the issue of the voluntariness of the plea,[13] whether there is a reasonable probability that, but for the alleged error, Caraballo would have decided not to plead guilty. See Dominguez Benitez, 542 U.S. at 83. We do so by looking at the entire record, and not just at what was directly before the district court during the plea hearing. Delgado-Hernandez, 420 F.3d at 28-32. In this case, the plea was entirely voluntary, and defendant was fairly apprised of both the law and the facts. See United States v. Cruz-Rivera, 357 F.3d 10, 13 (1st Cir. 2004) (holding defendant to guilty plea on plain error standard of review). Caraballo chose to

_____

[13]Caraballo has not argued more generally that he can show "that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." Dominguez Benitez, 542 U.S. at 83 (internal quotation marks omitted). He has waived any other argument based on the adequacy of the facts recited. Even if the issue had not been waived, as it has been, it is without merit. The facts presented with the plea reasonably constituted a basis on which the court could accept the plea. See United States v. Matos-Quiñones, 456 F.3d 14, 21 (1st Cir. 2006). Further, even if this court were to adopt some sort of affirmative misrepresentation requirement, Caraballo has not shown that his only partial disclosures were not affirmative acts and did not have some misleading effect.

plead guilty as part of an extremely favorable plea deal he and his counsel worked out with the government. He also chose to cooperate, and he admitted to participation in the drug conspiracy, for which he received a benefit. At his plea colloquy, Caraballo agreed with the prosecutor's statement that he was a "conspirator," an obvious reference to the drug conspiracy. Caraballo's deal was thus specifically structured to find a significantly less serious offense to which he could plead, and one which would permit him to avoid any imprisonment beyond the time already served. As Caraballo's own counsel stated at sentencing: "Initially [Caraballo] was tempted by the . . . economic gain that pervades the drug traffic, and he wavered. . . . But he took certain steps afterwards . . . and [the prosecutor] was wise enough and interested enough in justice that he reviewed that, and we came up with [this plea bargain]." Thus, even if the district court had erred in its understanding of misprision law, there is nothing in the record to suggest that the defendant would have been willing to risk trial on the conspiracy charges in the absence of the error. See United States v. Matos-Quiñones, 456 F.3d 14, 23 (1st Cir. 2006). Caraballo's substantial rights were not affected.

Under the fourth prong, we ask whether the plea arrangement calls into question the integrity of the judicial process. This case does not present the sort of miscarriage of justice for which plain error is reserved. United States v.

<u>Savinon-Acosta</u>, 232 F.3d 265, 269 (1st Cir. 2000). Caraballo, who participated in a major drug conspiracy, had his cooperation generously rewarded. He was sentenced to <u>time</u> <u>served</u> of less than sixteen months. If convicted of the original drug conspiracy or attempt charge involving more than five kilograms of cocaine, he faced a minimum sentence of "not . . . less than 10 years" under 21 U.S.C. §§ 841(b)(1)(A) and 846. If convicted of the original firearms charge, he faced an additional five years of imprisonment or more under 18 U.S.C. § 924(c)(1)(A)(i). Other officers who were convicted in this same conspiracy received lengthy terms of imprisonment on the order of twenty years. <u>Sánchez-Berríos</u>, 424 F.3d at 73; <u>Villafane Jimenez</u>, 410 F.3d at 78; <u>Vázquez Guadalupe</u>, 407 F.3d at 495; <u>Flecha-Maldonado</u>, 373 F.3d at 174. Whether or not the lesser charge of misprision constituted, on these facts, a viable theory of criminal liability, Caraballo, who was advised by counsel, not surprisingly agreed to plead guilty to that theory.

<u>Affirmed</u>.


**-Concurring and Dissenting Opinions Follow-**

**BOUDIN**, **Chief Judge**, **concurring**. From time to time in the course of plea negotiations, the government and the defendant join together in seeking to shoe-horn conduct into an offense less serious than that charged in the indictment. If and when the plea is accepted, the defendant occasionally seeks to have it both ways by later attacking the conviction, asserting that what he did does not constitute the crime of conviction. The barriers to attacks based on second thoughts are high.

If made in the trial court an attempted withdrawal of a guilty plea requires a "fair and just reason" for withdrawal. Fed. R. Crim. P. 11(d)(2)(B). If, as here, the effort is not made until the appeal, relief is discretionary and the defendant must meet the very stiff Olano standards for plain error: error, plainness, prejudice and something akin to a miscarriage of justice. United States v. Olano, 507 U.S. 725, 734 (1993); see also United States v. Mercedes Mercedes, 428 F.3d 355, 359 (1st Cir. 2005).

Caraballo-Rodriguez made his anonymous telephone call to the authorities after he may have already engaged in conduct that might have amounted to aiding in a drug conspiracy. Whether or not the call was made in good faith or was an anchor to windward is unclear. But the defendant was in some peril of being charged and convicted of a crime that could have netted him a long sentence. By the time of his guilty plea, he had already been indicted on

-33-

multiple counts of conspiring to distribute large amounts of cocaine and on a related firearms charge.

As for the government, it may have wished to reward the defendant's cooperation in securing convictions against others. Or the prosecutor might have had concern that a jury would give undue weight to the anonymous telephone call as supporting a claim, if made by the defendant, that he had no criminal intent and had merely played along in the conspiracy. And, any case settled by a guilty plea saves government resources for other prosecutions.

The district court held a hearing, described the offense, considered the proffer of evidence, heard the defendant admit guilt and found that there was a reasonable factual basis for the plea. No request to withdraw the plea was made in the district court. On appeal, Caraballo-Rodriguez says that misprision requires an affirmative act and that plain error occurred because the evidence did not show such an act and the requirement was not fully explained to him.

It turns out that, as the panel opinion shows, the law is fuzzy. This circuit has not precisely defined "concealment" and, even if concealment generally requires an affirmative act of some kind (as may well be the case), just what constitutes such an act in this context is debatable: conceivably, Caraballo-Rodriguez's half-complete and anonymous telephone call could be regarded as deceptive and affirmatively wrongful. It should not be assumed

-34-

that we must now resolve such issues as if this were an appeal after a conviction. Under Olano, far more is required for claims advanced for the first time on appeal.

If the government and the defendant had invented a wholly imaginary offense, or the district court had fundamentally mis-described the offense, or if the defendant had offered a factual predicate unrelated to the elements of the crime, letting the plea stand might well "seriously impair[] the fairness, integrity, or public reputation of the proceeding." United States v. Negrón-Narváez, 403 F.3d 33, 37 (1st Cir. 2005); see also United States v. Delgado-Hernandez, 420 F.3d 16, 28 (1st Cir. 2005).

But misprision of felony is a real crime and the district judge was required to do no more than give the required cautions, describe the crime and determine whether there was a factual basis for the plea. Fed. R. Crim. P. 11(b)(3).[14] This does not mean that the judge had to give final instructions or find that the defendant was guilty of the crime; it is enough that there was a rational basis for the plea. United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004).

---

[14]The district judge described the offense as charged in the information--concealment of information and the identities of conspirators in communications with federal agents--and defense counsel assured the court that he had reviewed the charges with the defendant. "Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty." Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005).

We have previously declined to find plain error where the issue was unsettled in the First Circuit and the law was not crystal clear.  See United States v. Diaz, 285 F.3d 92, 97 (1st Cir. 2002), and it is hard to say that there was plainly no basis for the plea or that the colloquy was plain error.  Nor is it a miscarriage of justice that the defendant--implicated in a serious drug crime--should be convicted by guilty plea for a closely related lesser crime of which he might have been convicted at trial.  See United States v. Colon-Nales, 464 F.3d 21, 28-29 (1st Cir. 2006).

Even in criminal cases the two sides are allowed over a broad range to reach their own accommodations.[15]  This serves both sides' interests or else the agreements would not be reached.  And if attempts to back out of such agreements were freely indulged, the agreements would less often be made.  As the Supreme Court has explained, relief from a guilty plea "will be difficult to get, as it should be."  United States v. Dominguez Benitez, 542 U.S. 74, 83 & n.9 (2004).

**-Dissenting opinion follows-**

---

[15]In addition to plea agreements, examples include stipulations of fact or of elements of the offense or issues arising in sentencing, Alford (North Carolina v. Alford, 400 U.S. 25 (1970)) and nolo contendere pleas, and knowing waivers of possible defenses.

**TORRUELLA**, <u>Circuit Judge</u>, **dissenting.** On May 24, 2001, Osvaldo Caraballo-Rodríguez learned of a conspiracy to commit drug trafficking. That same day, Caraballo contacted the DEA and told them about the conspiracy, but refused to give his name or those of the other participants in the conspiracy. Caraballo was then convicted, by guilty plea, of misprision of a felony, 18 U.S.C. § 4. Because partial but truthful disclosure of one's knowledge of a criminal activity is insufficient to sustain a conviction for misprision, I must respectfully dissent.

## I. <u>The Supplemental Appendix</u>

Before I reach the substance of Caraballo's appeal, I must first address the issue of the Government's "supplemental appendix." This "supplemental appendix" contains information not from Caraballo's conviction, but from another case initially brought against Caraballo but later dismissed. The Government urges us to consider this information in deciding this case. Our rules of procedure are clear. Fed. R. App. P. 10 states in relevant part:

> (a) Composition of the Record on Appeal. The following items constitute the record on appeal:
> > (1) the original papers and exhibits filed in the district court;
> > (2) the transcript of proceedings, if any; and
> > (3) a certified copy of the docket entries prepared by the district clerk.

The material offered by the Government was not part of the original papers or exhibits filed in the district court, nor is it a transcript of the proceedings or a certified copy of the docket entries.[16]  Thus, we cannot consider it on appeal.  See, e.g., Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 132 (1st Cir. 2005); Lewis v. City of Boston, 321 F.3d 207, 215 n.7 (1st Cir. 2003) ("It is elementary, however, that we review the record as it existed at the time the district court rendered its ruling . . . ." (emphasis added)).  The reasons for this rule are not trivial.  The district court is better suited for reviewing evidence and making findings of fact.  See Salve Regina College v. Russell, 499 U.S. 225, 233 (1991) (noting that "the respective institutional advantages of" a trial court include "the unchallenged superiority of the district court's factfinding ability").  Because of these institutional advantages, we accord deference to trial court rulings regarding the admissibility of evidence, see, e.g., United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002), and credibility, see, e.g., United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003).  Thus, we require that all evidence first be placed before a district court because an appellate court's chief competence is not evidentiary review.  This is especially true here, where

---

[16]The district court eventually transmitted a record to this court which referred to the documents in the supplemental appendix, but this record only noted that the documents were part of the record in the conspiracy case, No. 01-613, rather than the misprision case.

Caraballo raises a number of challenges to the admissibility and credibility of the material the Government seeks to introduce.[17]

Furthermore, the fact that the judge was the same in both criminal cases, or that the dockets are "intertwined" has no effect on this conclusion; we generally do not allow parties in one case to sift through the dockets of other cases to come up with evidence to support their conclusions on appeal. The majority, in reaching its conclusion, cites two cases for the proposition that judges may reach across case lines and disregard evidentiary rules in the sentencing context: United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005) ("[T]he district court may consider all the evidence, even if inadmissible under the Federal Rules of Evidence, provided that the information has 'sufficient indicia of reliability to support its probable accuracy.'") and United States v. Canada, 960 F.2d 263, 267-68 (1st Cir. 1992) (approving use of transcripts from codefendant's trial at sentencing hearing). These cases are unpersuasive for the simple fact that they address sentencing. Caraballo is not challenging his sentence; he is challenging his conviction, and we have not yet disregarded evidentiary rules when reviewing a conviction. In any case, regardless of whether the

_____

[17]It is worth noting that although I agree with the majority that a document need not be admissible in evidence to be part of the record on appeal, it would need to be admissible for a district judge to consider it, and we would rule it error for the district judge to have relied on inadmissible evidence in coming to its conclusion. See Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 114 (1st Cir. 2006).

supplemental appendix is being used to sustain a conviction or a sentence, it was not presented to the district court in Caraballo's misprision case, and as such, we may not consider it. United States v. Muriel-Cruz, 412 F.3d 9, 12 (1st Cir. 2005) ("Absent extraordinary circumstances, not present here, we consult only the record extant at the time the district court rendered its decision."); United States v. Onyejekwe, No. 94-1772, 1995 WL 397015, at *1 n.1 (1st Cir. July 6, 1995) (unpublished opinion) ("We note that appellant's appendix includes many documents which were not filed in the district court--including transcripts of testimony before the grand jury--and are, thus, outside the record. These latter documents, of course, cannot inform our decision [on the appellant's sentencing appeal]." (citation omitted)). Simply put, the majority offers no compelling reason for us to disregard our consistently applied rule that we only consider evidence presented in the district court. I see no reason to disregard it in this case.[18]

---

[18]In similar cases, where a defendant has challenged the factual basis of a plea and the Government has responded with additional evidence, other courts have suggested that a court might either vacate the plea entirely or simply remand the case to the district court for consideration of the new evidence. See, e.g., United States v. Goldberg, 862 F.2d 101, 107 (6th Cir. 1988) ("The second alternative is to remand the case to permit the government to supplement the record on the issue of 'active concealment' in an attempt to satisfy the district court of the existence of a factual basis for Goldberg's plea of guilty."). By deferring to a district court's expertise in fact-finding, this would seem to be a more sensible resolution of Caraballo's objection to the supplemental appendix.

## II. **Caraballo's Plea**

### **A. Standard of Review**

Before accepting a plea agreement, the Federal Rules of Criminal Procedure require that a district court "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). Thus, the district court must make a finding that "on the record as it stands at the time of the plea," it has "a reasoned basis to believe that the defendant actually committed the crime to which he is admitting guilt." United States v. Matos-Quiñones, 456 F.3d 14, 21 (1st Cir. 2006). "The purpose of this requirement is to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.'" United States v. Ventura-Cruel, 356 F.3d 55, 59-60 (1st Cir. 2003) (quoting Advisory Committee Notes to the 1966 Amendment to Fed. R. Crim P. 11.).

When an appellant pleads guilty and does not move to withdraw his plea on the basis that the district court did not comply with Rule 11, the Supreme Court has held that the appropriate standard of review is plain error. United States v. Vonn, 535 U.S. 55, 58-59 (2002). Thus, Caraballo must demonstrate that "(1) there was error; (2) the error was plain; (3) the error affected the defendant's substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of

-41-

judicial proceedings."  <u>United States</u> v. <u>Riggs</u>, 287 F.3d 221, 224 (1st Cir. 2002).

### B. Was There Plain Error?

Caraballo pled guilty to misprision of a felony in violation of 18 U.S.C. § 4, which provides:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

The majority and I are in general agreement on the facts. Caraballo was offered the opportunity to help his partner, a corrupt police officer, with "escorting" cocaine to a drop-point at the Carolina Mall in Puerto Rico.  Caraballo called the DEA and told them of the plan, but refused to give his name or the names of those involved.[19]

_____

[19]The majority's version of the facts relies heavily upon the supplemental appendix provided by the Government, which, as I have stated, cannot be considered on appeal because it was not presented to the district court.  Thus, for example, we may not consider any of the evidence presented that Caraballo had actually committed the crime of conspiracy, a fact which has never been proven in any court.  The prosecutor's fleeting reference to "Caraballo and his co-conspirators" does not establish Caraballo's guilt, especially when one considers that the full statement made during the plea colloquy was "Specifically, when the agents asked him for information regarding the conspiracy that might identify the Defendant or his co-conspirators, <u>or the conspirators in the case</u>, he declined to furnish the specific information regarding the plot at that time."

However, to the extent that the majority relies on the

There is no dispute that Caraballo had knowledge of the "actual commission" of a felony.[20]  For the purposes of argument, I will assume that Caraballo did not make the felony known "as soon as possible" to the authorities.[21]  The question then is whether Caraballo "concealed" the felony.  The majority acknowledges the absence of any act of concealment on Caraballo's part and instead relies on two theories without any support in the law, which

---

Government's supplemental appendix, I would add that not only did Caraballo-Rodríguez make a full report to the DEA regarding what happened during the cocaine escort, but he also gave the DEA all of the money he had received, a fact not mentioned by the majority.

[20]The only felony whose "actual commission" Caraballo is alleged to have known was a conspiracy to distribute cocaine.  21 U.S.C. § 846.  The majority also alleges that Caraballo was a member of this conspiracy.  Thus, in effect, the majority suggests that we are able to punish Caraballo for failing to report his own crime.  Certainly, criminally punishing someone for failing to incriminate themselves implicates the Fifth Amendment privilege against self-incrimination.  See United States v. Kuh, 541 F.2d 672, 677 (7th Cir. 1976) ("If the duty to notify federal authorities [of criminal conduct] is precluded by constitutional privilege, it is difficult to understand how a conviction [for misprision] could be substantiated [when the defendant is also involved in the criminal conduct].").  The majority suggests that by pleading guilty, defendants waive this privilege.  However, it would be a very odd crime indeed which could only be prosecuted by guilty plea.

[21]Although I assume this fact for the sake of argument, it is not entirely clear.  First, in his initial call to the DEA, Caraballo did in fact make the conspiracy "known," although he did not provide additional details.  In addition, under the majority's version of the facts, which are tainted by reference to the supplemental appendix, Caraballo later called the Government and informed them in painstaking detail about the conspiracy.  The Government makes no attempt to argue that this later report was not made "as soon as possible."

constitutes an overextension of the plain error doctrine, to circumvent the affirmative act requirement.

### 1. Misprision Requires An Affirmative Act

First, the majority suggests that, in fact, 18 U.S.C. § 4 contains no requirement that a defendant commit an affirmative act of concealment. Thus, the majority attempts to write the word "conceals" out of the statute and suggests that Caraballo can be convicted solely on the basis of (1) knowledge of a felony and (2) inaction. In effect, the majority suggests that 18 U.S.C. § 4 imposes an affirmative duty on every citizen to report any crime that is "known" to them. I agree with the majority that, in general, it would be beneficial to have our citizenry report crimes. See Roberts v. United States, 445 U.S. 552, 558 (1980) ("[G]ross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.").

That, however, is not the law. The misprision statute imposes no legal obligation on citizens to report crime, especially where failure to comply with that obligation is criminally punishable.[22] Every court to have considered the issue, including

---

[22]In fact, it is the lack of affirmative duties (including a duty to report crimes) that remains one of the hallmarks of the distinction between common law jurisdictions (such as the United States) and civil law jurisdictions (such as those in Europe). Compare Martin Vranken, Duty to Rescue in Civil Law and Common Law: Les Extrêmes Se Touchent?, 47 Int'l & Comp. L. Q. 934, 937 (1998) (noting that "the French [civil] legal system can lay claim to [providing] 'the greatest encouragement to the Good Samaritan'"), with Liam Murphy, Beneficence, Law, and Liberty: The Case of

the Supreme Court, has reached the same conclusion.  See Roberts,

445 U.S. at 558 n.5 ("[The misprision statute] has been construed

to require 'both knowledge of a crime and some affirmative act of

concealment or participation.'");[23] Branzburg v. Hayes, 408 U.S.

665, 696 n.36 (1972) (same); United States v. Bolden, 368 F.3d

1032, 1037 (8th Cir. 2004) ("[Misprision] requires proof of

'affirmative steps' to conceal a known felony. . . ."); Itani v.

Ashcroft, 298 F.3d 1213, 1216 (11th Cir. 2002) ("Misprision of a

felony 'require[s] both knowledge of a crime and some affirmative

act of concealment or participation.'" (alteration in original));

United States v. Gebbie, 294 F.3d 540, 544 (3d Cir. 2002) (holding

---

Required Rescue, 89 Geo. L.J. 605, 606 (2001) (discussing the
common law maxim that "positive legal duties threaten the common
law's traditional deference to individual liberty").  To the extent
that  our system of law has imposed duties to act, they have been
imposed in order to prevent harm or peril to another.  See
generally Melody J. Stewart, How Making the Failure to Assist
Illegal Fails to Assist: An Observation of Expanding Criminal
Omission Liability, 25 Am. J. Crim. L. 385, 392-96 (1998)
(discussing the role of traditionally recognized criminal-law
duties).  Furthermore, criminal liability for omissions has been
imposed only when the defendant's omission can be said to have
caused the harm or peril.  See Arthur Leavens, A Causation Approach
To Criminal Omissions, 76 Cal. L. Rev. 547, 562 (1988) (recognizing
"the critical underlying premise that criminal omissions can occur
only in 'cause-and-result' crimes, that is, crimes that proscribe
the causation of a particular harm").  The misprision statute
addresses conduct after any harm has occurred because it punishes
concealment only after the actual commission of a felony.
Furthermore, misprision does not appear to incorporate any element
of causation, thus further suggesting that any common law analysis
of criminal omission liability is inapposite.

[23]It is worth noting that this is the "footnote omitted" in the
long quote from Roberts on pages 20-21 of the majority opinion.

that an element of misprision is that defendant "took steps to conceal the crime"); United States v. Cefalu, 85 F.3d 964, 969 (2d Cir. 1996) (same); United States v. Vásquez-Chan, 978 F.2d 546, 555 (9th Cir. 1992) ("that the defendant took an affirmative step to conceal the crime"); United States v. Adams, 961 F.2d 505, 508-09 (5th Cir. 1992) ("must commit an affirmative act"); United States v. Goldberg, 862 F.2d 101, 104 (6th Cir. 1988) ("[Misprision requires that] the defendant took affirmative steps to conceal the crime of the principal. Mere knowledge of the commission of the felony or failure to report the felony, standing alone, is insufficient to support a conviction for a misprision of a felony."); United States v. Andrews, 790 F.2d 803, 809 (10th Cir. 1986) ("the accused took an affirmative step to conceal the crime"); United States v. Sampol, 636 F.2d 621, 653 (D.C. Cir. 1980) ("wilful concealment from the authorities by some affirmative act"); United States v. Kuh, 541 F.2d 672, 676 (7th Cir. 1976) ("[Misprision] consists of an act of concealment in addition to failure to disclose, so that the statute did not purport to punish one solely for failure to report facts which he has reasonable fear might lead to his conviction of crime."). Legal commentators, including those cited by the majority, have been equally unanimous in their understanding that the misprision statute, as it currently stands, "has been uniformly construed to require both active concealment and a failure to disclose." Christopher Mark Curenton,

-46-

Comment, The Past, Present, and Future of 18 U.S.C. § 4: An Exploration of the Federal Misprision of Felony Statute, 55 Ala. L. Rev. 183, 185 (2003)("In order for a conviction to be sustained, there must be a concealment--not merely an omission or failure to report criminal activity."); see also Carl Wilson Mullis, III, Comment, Misprision of Felony: A Reappraisal, 23 Emory L.J. 1095, 1103 (1974) ("Bratton [v. United States, 73 F.2d 795 (10th Cir. 1934)] firmly established the necessity of a positive act of concealment for violation of the federal misprision statute."). The result is that it is fairly plain from the statute that the language "conceals and" requires an affirmative act:

> The language is "conceals and does not as soon as may be disclose." [sic] Some meaning must be given to the words "conceal and." If it should be held that a failure to disclose is in itself a concealment, then a conviction may be had for a failure to disclose without more, and the words "conceal and" are thus effectively excised from the statute. Following settled rules of construction, we must assume that Congress intended something by the use of the words "conceal and."

Bratton, 73 F.2d at 797.

Nevertheless, the majority cites United States v. Vázquez-Alomar, 342 F.3d 1 (1st Cir. 2003), as providing support for the lack of an affirmative act requirement. I disagree with their reading. Vázquez-Alomar simply stated that the defendant "did not inform the authorities of these conversations, as federal law requires. [18 U.S.C.] § 4." 342 F.3d at 2. Vázquez-Alomar did

-47-

not involve any challenge to or question regarding the defendant's conviction for misprision. This naked citation appears to have been provided merely as background to a case dealing with a defendant's appeal of the district court's application of unrelated sentencing guidelines. Id. at 5-6. It is at a minimum difficult to conclude from this brief offhand comment in a sentencing case, unaccompanied by any further explanation, that this Circuit intended to split with over seventy years of pronouncements on the elements of misprision by the Supreme Court and ten other courts of appeal.

The majority also suggests that United States v. Ciambrone, 750 F.2d 1416 (9th Cir. 1984), is of little use to Caraballo. In fact, in Ciambrone, the Ninth Circuit found that partial but truthful disclosure of a crime to the police was not the required "affirmative act" for the purposes of the misprision statute. Id. at 1418. This conclusion is logical, given that a partial and truthful disclosure provides the authorities with, at worst, no information, and at best, some helpful information. Accordingly, such disclosures cannot be considered an "affirmative act of concealment." The majority criticizes Ciambrone on two grounds. First, the majority notes that no other court has followed Ciambrone. But a number of courts have cited Ciambrone for the proposition that an affirmative act of concealment is required. See, e.g., Cefalu, 85 F.3d at 969; United States v.

Vásquez-Chan, 978 F.2d 546, 555 (9th Cir. 1992); Goldberg, 862 F.2d at 104-105; United States v. Weekley, 389 F. Supp. 2d 1293, 1297 (D. Ala. 2005).  The majority also argues that Ciambrone departs from the common law position that no affirmative act is required.[24] This is true, but the common law position on misprision is of limited relevance because Congress was free to depart from the common law in requiring an affirmative act for the misprision offense.  There are no federal common law crimes.  Liparota v. United States, 471 U.S. 419, 424 (1985).  Given the unanimity of decisions stating that misprision does require an affirmative act, it is clear that Ciambrone does represent a proper interpretation of the law.

The majority then departs even further from the misprision statute in suggesting that the affirmative act requirement may be excused because Caraballo was a police officer, and he had a duty to report crime under P.R. Laws Ann. tit. 25, § 3102.  As an initial matter, the majority's references to English common law are of questionable relevance to this analysis.  It has

---

[24]On page 26 and in footnote 10 of the majority opinion, the majority also suggests that "even a truthful but partial disclosure could conceal by misleading."  This is another example of the majority stretching the definition of the statute in favor of the Government.  In addition, the Government made no allegation of fact in the district court that Caraballo's brief phone call to the DEA was misleading.  That the partial disclosure might have been misleading in other circumstances seems utterly irrelevant considering that the Government in this case had full knowledge of the facts.

long been understood that "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." Liparota, 471 U.S. at 424; see also United States v. Hudson & Goodwin, 11 U.S. 32, 33 (1812) (deciding that federal courts could not "exercise a common law jurisdiction in criminal cases."). That misprision was thought to have been an appropriate charge for derelict officers in fifteenth century England is nothing more than an interesting historical footnote, unless the majority can show that Congress considered and adopted this history in drafting 18 U.S.C. § 4.[25]  Modern English law decisions are of even less relevance, as they fail to reflect the common law as it existed when Congress was drafting the misprision statute.  Perhaps the majority emphasizes the history of the misprision crime in England because in this country, there is no support in the plain language of the statute or the case law for excusing the affirmative act requirement for police officers.[26]  Even the law review note cited by the majority agrees that current law provides no such support.

---

[25]Of course, to date, no reported decision in the history of jurisprudence in the United States has mentioned what would appear to be a fairly large "exception" to the affirmative act requirement.

[26]That Caraballo was a state police officer who is being punished for failing to report a federal crime to federal authorities may raise federalism concerns.  See Printz v. United States, 521 U.S. 898, 922 (1997) (finding that requiring state officers to enforce a federal gun-control law violates the tenth Amendment).

Curenton, supra, 55 Ala. L. Rev. at 185 ("[U]nlike its English counterpart, the phrasing 'conceals and does not as soon as possible make known' has been uniformly construed [by American courts] to require both active concealment and a failure to disclose.").

Even if the Government's second theory were plausible, it suffers from an additional serious defect. The class of people in this country with some sort of duty to report crime is quite numerous. See, e.g., 28 U.S.C. § 547 ("[E]ach United States attorney, within his district, shall--(1) prosecute for all offenses against the United States."); Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1480 (9th Cir. 1996) ("[A]ll federal employees labor under a duty to report fraud against the government."). Although many officers of the Government labor under such a duty to report wrongdoing, it is clear from Supreme Court precedent that these duties to report crime are not absolute. With respect to police officers, there is a "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands." Town of Castle Rock v. Gonzáles, 545 U.S. 748, 760-61 (2005). In fact, in Town of Castle Rock, the Court explicitly stated that duty-to-report statutes (such as P.R. Laws. Ann. tit. 25, § 3102) "clearly do not mean that a police officer may not lawfully decline to make an arrest." Id. (quoting 1 ABA Standards for Criminal Justice 1-4.5, commentary, at 1-124 to

1-125 (2d ed. 1980)).[27]  Given that Caraballo could have "lawfully decline[d] to make an arrest" in this case, I have some difficulty with the proposition expounded by the majority, based on irrelevant English common law, that under the facts of this case he incurred federal criminal liability under the misprision statute.

## 2. Accepting Caraballo's Plea Was Plain Error

Finding no support for either of the aforementioned theories, the majority then resorts to the plain error standard to sustain Caraballo's conviction.  Having conceded that it might be error for the court to have overlooked the affirmative act requirement, the majority suggests that it was not plain error because no decision of this Circuit has ever rejected the extraordinary theory that a citizen may be convicted under federal law for merely failing to report a crime.  But in accepting Caraballo's plea, it was incumbent on the district court to examine "the relation between the law and the acts the defendant admits having committed."  McCarthy v. United States, 394 U.S. 459, 467 (1969).  Not only does the misprision statute make clear that an element of "concealment" is required, but two Supreme Court cases and unanimity in the case law should be sufficient to make the error in the majority's reasoning "plain."  See United States v.

_____

[27]Town of Castle Rock found that a police officer's failure to perform his statutory duty to report and investigate crime could not even give rise to civil, let alone criminal, liability. Id. at 766.

-52-

Rodríguez-Pacheco, 475 F.3d 434 (1st Cir. 2007) (discussing the fact that the majority's reading of an ambiguous question of prior precedent "agrees with that of every circuit that has addressed the question"); see also Colby v. J.C. Penney Co., 811 F.2d 1119, 1123 (7th Cir. 1987) ("Bearing in mind the interest in maintaining a reasonable uniformity of federal law and in sparing the Supreme Court the burden of taking cases merely to resolve conflicts between circuits, we give most respectful consideration to the decisions of the other courts of appeals and follow them whenever we can."). The decisions of the Supreme Court and our sister circuits are most certainly difficult to overlook. That our court has not spoken as to the issue should not foreclose a finding of "plain error," especially given the "archaic" and "uncommon" nature of the crime. Roberts, 445 U.S. at 558; Goldberg, 862 F.2d at 109. Otherwise, under the majority's approach, any theory of conviction, regardless of its support in the law, could pass plain error review so long as we have not rejected it.

The majority also suggests that we may affirm Caraballo's conviction because the district court merely chose between two competing interpretations of the misprision statute. Although we have held that a court's choice of two competing interpretations of a statute will not be disturbed on a plain error standard, these competing interpretations have had some support in the case law. See, e.g., Correa v. Hospital San Francisco, 69 F.3d 1184, 1196-97

-53-

(1st Cir. 1995) (finding support for both plaintiff's and defendant's interpretations of 42 U.S.C. § 1395dd(d)(2) in decisions from other circuits). Here, as the majority concedes, any interpretation of the misprision statute that does not require an affirmative act is not truly "competing": no court anywhere has adopted either of the Government's proposed interpretations, and in fact, every court to have considered them has rejected them.[28]

The majority also suggests that even if there was plain error, it was not prejudicial. This conclusion rests on the statement in United States v. Domínguez Benítez that to prove prejudice, a defendant must "show a reasonable probability that, but for the error, he would not have entered the [guilty] plea." 542 U.S. 74, 83 (2004). We have applied this standard before where a defendant has argued that there was no factual basis to support his guilty plea. See United States v. Delgado-Hernández, 420 F.3d 16, 20 (1st Cir. 2005). Likewise, the majority suggests that Caraballo's conviction did not "adversely impact[] the fairness,

---

[28]Moreover, if Caraballo had taken the time to pore over all of the court decisions on this question, he would have found no indication whatsoever that his failure to report the conspiracy was criminally punishable. "Obviously, citizens should not be subject to punishment without fair notice that their conduct is prohibited by law." United States v. Thompson/Center Arms Co., 504 U.S. 505, 525 (1992). There is no reason to think that this requirement is somehow less valid when a defendant pleads guilty to a crime. By dodging the question of whether failure to report a felony constitutes misprision, the majority creates substantial uncertainty as to whether such omissions may be punished in the future.

integrity, or public reputation of judicial proceedings." <u>Riggs</u>, 287 F.3d at 224.

It is hard for me to see how Caraballo would not be prejudiced, or the public reputation of judicial proceedings would not be adversely impacted if we affirm his conviction without any factual basis to support it. First, it is important to point out that in <u>Delgado-Hernández</u>, we decided that the Defendant was not prejudiced by his guilty plea because it was supported by an adequate factual basis. <u>Id.</u> at 32. We found, based on the evidence placed on the record before the district court, that if the Government had made a proper factual proffer, it could have established a factual basis for the defendant's plea. <u>Id.</u> at 29; <u>see also</u> <u>United States</u> v. <u>Sawyer</u>, 239 F.3d 31, 50 (1st Cir. 2001) ("To justify Sawyer's guilty plea, it was enough that the government pointed to evidence, or proffered facts, that would furnish a rational basis for the plea.") (Boudin, J., concurring). The same cannot be said here, where accepting all of the Government's factual allegations as true, there is still no evidence to establish an affirmative act of concealment.

Furthermore, the entire purpose of the Rule 11 requirement that a district court find a factual basis for a plea is to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within

-55-

the charge." McCarthy, 394 U.S. at 467 (quoting Fed. R. Crim. P. 11, advisory committee's note). To put it another way, we do not allow a defendant to plead guilty without making some sort of determination, however cursory, that the defendant's conduct is criminally punishable. As the record stands, even assuming the complete truth of the Government's allegations, Caraballo plainly did not commit the crime of misprision because he did not commit an affirmative act of concealment. Nevertheless, he was allowed to be convicted. Thus, there is before us the conviction of a man who is plainly not guilty of the crime for which he was charged. A miscarriage of justice more prejudicial would be difficult to find.[29]

The Chief Judge's concurrence improves on the majority opinion by not giving much credence to either of the Government's proposed theories. But the concurrence still gets it wrong. When a defendant challenges a plea accepted by the district court, we

---

[29]Many courts have stated that the government's failure to prove each element of an offense beyond a reasonable doubt at trial is both prejudicial and a miscarriage of justice. See, e.g., United States v. Groves, 470 F.3d 311, 327-328 (7th Cir. 2006) ("[A]llowing a conviction to stand without proof of an essential element of the crime meets the standard for plain error . . . ."); United States v. Gaydos, 108 F.3d 505, 509 (3d Cir. 1997) ("We believe that affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt 'affects substantial rights,' and seriously impugns 'the fairness, integrity and public reputation of judicial proceedings.'"). Here, the Government cannot even meet the minimal burden of showing that Caraballo committed a crime taking as true all of the facts that the Government alleged.

grant the Government the extraordinary indulgence of not requiring that they provide any evidence to support the plea.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Fountain</u>, 777 F.2d 351, 355 (7th Cir. 1985) ("A sufficient factual basis can be found even when the court engages in the most rudimentary questioning of the defendant if the indictment and statement of the prosecution's evidence are sufficiently specific to make clear to the defendant exactly what is being admitted to.").  We will allow a plea to rest on the Government's allegations alone, so long as they were presented to the district court.  <u>Sawyer</u>, 239 F.3d at 50 (Boudin, J., concurring).  This supports the policy of discouraging defendants from seeking to withdraw their pleas by later claiming, "I didn't do it."

However, the law does not allow us to affirm a plea simply because the Government states "the defendant committed a crime."  Rather, we must determine that the defendant's conduct, as alleged by the Government, constitutes a crime.  <u>See</u> <u>United States</u> v. <u>Negrón-Nárvaez</u>, 403 F.3d 33, 37 (1st Cir. 2005) ("At its most abecedarian level, the requirement that a guilty plea must be supported by an adequate factual basis ensures that the conduct to which the defendant admits constitutes the crime with which he is charged.").  Not "maybe a crime," not "possibly a crime," but a crime as codified in the United States Code.  The misprision statute, codified at 18 U.S.C. § 4, requires "concealment."  Any

-57-

reasonable reading of this statute suggests that an affirmative act is required, as has been confirmed by years of unanimous precedent. The majority and concurring opinions raise the question of whether we should decide that a defendant can be convicted because he might have committed a crime that we might define differently in the future. In a system of justice that requires that defendants be provided with notice of prohibited conduct, the answer is a clear "No."

Finally, I think it is important to address the majority opinion's concluding statements. The majority assuages its concerns about the result by stating that Caraballo "participated in a major drug conspiracy," and that other officers in the conspiracy received lengthy terms of imprisonment. Thus, the majority contends, Caraballo benefitted from his plea agreement and is now looking a gift-horse in the mouth. It has long been my understanding that defendants are entitled to the presumption of innocence until proven guilty. Caraballo's indictment alone does not establish that he is guilty of the crimes charged. Perhaps he did, as the majority contends, plead guilty to avoid prison time on more serious charges. Perhaps the Government had an interest in offering Caraballo a plea, as the concurrence suggests, because the Government had concerns about its own ability to obtain a conviction in the conspiracy case. Perhaps Caraballo was erroneously told that misprision charge against him was airtight

because it required no showing of an affirmative act.  We may never know why Caraballo pled guilty to the misprision charge, but it is ultimately irrelevant.  Our country is a nation of laws, and we do not countenance the conviction of a defendant for a crime he did not commit simply because we suspect that he was bad or may have committed other crimes.  A defendant must engage in the proscribed charged conduct to be found guilty of a crime, whether by plea or by trial.  Because Caraballo did not engage in the conduct proscribed by 18 U.S.C. § 4, I would reverse his conviction.  Accordingly, I dissent.