David Edward **LANCEY**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19854.

United States Court of Appeals
Ninth Circuit.

Feb. 3, 1966.

Rehearing Denied April 4, 1966.

Edward L. Cragen, San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before BARNES, BROWNING and DUNIWAY, Circuit Judges.

BARNES, Circuit Judge:

This is an appeal from a final judgment of conviction in the United States District Court for the Northern District of California, Southern Division, convicting the appellant, after trial by court, of violation of 18 U.S.C. § 4, to wit, misprision of a felony, i. e., bank robbery. (Count II.)

Appellant was sentenced to a term of three years imprisonment, to serve six months, the remainder of the sentence of two years and six months suspended, and to a period of probation for three years.

Appellant was found not guilty of the violation of Count I (18 U.S.C. § 3)—an accessory after the fact.

Jurisdiction existed below pursuant to 18 U.S.C. § 3231, and exists in this court on appeal, 28 U.S.C. § 1291.

Four errors are alleged on appeal:

(1) Insufficiency of the evidence.

(2) Error in admission of hearsay testimony.

(3) The only testimony that appellant did not inform the authorities of (the bank robbers' presence in his home) was that of Melba Marshall, and her testimony was erroneously admitted over objection based on the husband-wife privilege.

(4) Error in not requiring production of grand jury testimony of Al Salciccia.

Lancey, at the time of his arrest, was living under the assumed name of Harold Marshall in San Jose, California. A warrant for his arrest was in the hands of local police, as a fugitive from justice for two years, charged with a violation of the Dyer Act. (18 U.S.C. § 2312.)

The bank robbery was perpetrated by one George Zavada on June 11, 1964. It was a Bank of America branch in Sacramento, California. $74,000 had been taken by the use of a pistol and an attache case wired with three sticks of dynamite, explodable at will.

On June 12, 1964, some thirty agents of the Federal Bureau of Investigation were assembled around the vicinity of 3465 Meridian Street, San Jose, California, the home of appellant. Bank personnel, after the robbery, had identified Zavada as the robber, and the *modus operandi* fitted Zavada's technique. Unknown to Zavada, the car he was using in the Sacramento bank robbery had been observed and its license number noted. Agents had also previously heard, during intensive investigation to locate Zavada prior to the bank robbery, that he might contact a "Hal" in San Jose who was an accountant and had contacts with other criminals.

The San Jose investigation had disclosed a Harold Marshall, self-employed as an accountant and identified from police intelligence sources as a person associated with the criminal group in San Jose.

In the intensive manhunt which started after Zavada's bank robbery at Sacramento, agents had noted the car used by Zavada in the driveway of Harold Marshall's residence. Agents had also determined, through photographs flown to San Franciso and San Jose that Harold Marshall was one David Lancey, a federal fugitive for almost two years.

The residence and car were put under surveillance by the FBI and a call to San Francisco made to obtain additional manpower to effect Zavada's arrest.

While awaiting help, an FBI resident agent of San Jose, Agent Marron, saw Zavada and "Marshall" leave the house, drive to a branch of the Bank of America, go in, return to their car and drive back to Marshall's house.

While the Special Agent in Charge and his men were debating the risks of a move against Zavada in the Lancey residence, he made the decision for them. At about 8:30 P.M., Zavada, alone, took an evening stroll in the warm spring air.

Cars of the FBI rolled up to the curb in front of Zavada, who now had reached an area adjoining a vacant lot. A Special Agent jumped from the car, commanding Zavada to "Stop—FBI" as some ten other agents piled out of two other vehicles which had pulled up.

Zavada began to run sideways into the vacant lot, grabbing at his waistband underneath his sweater, and pulling out an automatic which he fired at the onrushing agents.

As Zavada's shots rang out, the blast of a shotgun fired by an FBI agent caught him in the side of his chest and right arm, throwing him over a mound of dirt and onto the ground. He landed in a pool of blood with his weapon under him.

Instantly surrounded, he acknowledged he was Zavada and asked for a cigarette.

Thereupon, the agents went back to the "Marshall" residence and placed appellant under arrest.

### I—*Insufficiency of the Evidence*

Whether the evidence is insufficient to support a conviction of the crime of misprision depends upon how one interprets § 4 of Title 18, United States Code.

Appellant urges that the crime is not a harboring offense—that it relates to the concealment of the crime or elements thereof, and not to a concealment of the location of the perpetrator.

Since the authorities knew of the crime as well as the identity of the suspected perpetrator long before he arrived at appellant's residence, the latter cannot be charged with a duty to report the offense and the perpetrator thereof, urges appellant.

Whether the government knew of the fact of commission, and the perpetrator thereof, is immaterial, says the government. If one has actual knowledge that a felony has been committed, and who committed it, then he is required to come forward and reveal that knowledge, "as soon as possible."

Each party suggests that Neal v. United States, 102 F.2d 643 (8th Cir. 1939), is the leading case on the subject. (For subsequent history of the Neal case, cf. Neal v. United States, 114 F.2d 1000 (8th Cir. 1940), cert. den. 312 U.S. 679, 61 S.Ct. 448, 85 L.Ed. 1118 (1941).) That case holds:

> "To sustain a conviction * * * for misprision of felony it was incumbent upon the government to prove beyond a reasonable doubt (1) that * * * the principal, had committed and completed the felony alleged * * * ; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took * * * affirmative steps to conceal the crime of the principal." 102 F.2d at 646.[1]

Thus whether the government did or did not know of the crime or who the perpetrator was is unimportant. Neither one is mentioned as an essential element

---

1. One of the "affirmative steps" charged in Neal was that he had concealed part of the money stolen in a golf bag, but this was not proved.

of the proof of the crime of misprision. No case is cited by appellant in support of his position. (Appellant's Op. Brf. p. 14.) United States v. Perlstein, 126 F.2d 789 (3d Cir.), cert. den. 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942), is cited because of · its definition of misprision (which the case was not about), but that definition, quoting Bouvier, includes but one element: "the concealment of felony without giving any degree of maintenance to the felon." (126 F.2d at 798.)

▮ We find no cases supporting appellant's legal position, or going beyond the four essentials noted in Neal, supra. Mere silence, without some affirmative act, is insufficient evidence. United States v. Farrar, 38 F.2d 515 (D.Mass.), affirmed 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930). A harboring of the criminal, with full knowledge, may be the positive act required to constitute the required concealment. Bratton v. United States, 73 F.2d 795 (10th Cir. 1934). And cf. United States v. Thornton, 178 F. Supp. 42 (E.D.N.Y.1959); United States v. Worcester, 190 F.Supp. 548 (D.Mass.

1961); Grudin v. United States, 198 F.2d 610 (9th Cir. 1952).

Here it may well be that despite the defendant's knowledge that Zavada was named on television as the bank robber, and that the method used coincided with Zavada's *modus operandi*, when he heard this television news at 8:00 P.M. on June 11, 1964, or even at 11:00 P.M. when he recorded a second television newscast, he had no obligation to notify the civil authorities.

But one half hour later, when Lancey's telephone rang and he was told to pick up Zavada at a street intersection in San Jose, he had information the civil authorities presumably did not have. One and one half hours later when Zavada came to Lancey's home, carrying thousands of dollars in a laundry type bag, any lack of certain knowledge as to the commission of a felony and who had committed it was laid at rest.

From 1:00 A.M. to 3:30 A.M. Lancey and Zavada counted the money. We set forth their subsequent activities in the margin.[2]

2. Zavada slept at the Lancey house and ate breakfast with the Lanceys. During the day Zavada read accounts of the robbery and played a tape recording he had made of a news broadcast of the robbery.

During the day Mrs. Marshall served coffee; Zavada made no threats to her nor did she see any weapons. She saw no large amounts of money or travellers checks. Lancey was nervous during Zavada's stay. He did not shave on the day Zavada was captured—although he usually shaved every day. During the day, when his lawyer had made a joke mentioning the FBI to someone on Lancey's phone while in Lancey's presence, appellant "bolted" and seemed startled.

In the afternoon, Mrs. Marshall took Zavada for a drive to get him out of the house and away from Tom Salciccia, Lancey's attorney, who, Lancey had told his wife, "didn't get along very good together." Zavada left his attache case, which held the bank robbery loot, in the house with Lancey. He sat around in the evening "just staring into space."

After his arrest Lancey led agents to the tape recording he had made of the news broadcast of Zavada's bank robbery

and surrendered the tape to them. He told the agents that Zavada's dynamite was in the car in front of the house, and might be wired to explode. The car keys were in Lancey's pocket. Padden took the keys out of Lancey's pocket.

Money from the Sacramento bank robbery was also in Lancey's pocket. Lancey had a total of $330.00 in his pocket. It is possible that some of it was for a payoff to the man who supplied Zavada with the dynamite, but no evidence was ever produced on this point.

Upon being asked where the money from the bank robbery was, Lancey told Special Agent Padden most of it was in a black attache case and led them to a bedroom. In the bedroom Lancey told them to look in the third drawer and they recovered the attache case, containing $48,360.00 in cash. Lancey said the balance of the loot—stolen travelers checks—was in a box in the garage.

Lancey took the agents into another bedroom and indicated where a .22 caliber fully loaded gun could be found in the bedstand. The gun was in a holster.

Lancey and the agents returned to the livingroom. Lancey indicated a desire to

Lancey raises as a defense his fear of Zavada. Were this a defense, there seldom could be a conviction. Because of fear, and because Zavada stayed close to him, appellant says he had no opportunity to call the authorities.

We point out he did have ample opportunity—either in the afternoon when Zavada went for a drive with Mrs. Marshall, and visited a tailor's shop for a fitting, or when Zavada left the home for an evening stroll at 8:30 P.M., or when Zavada asked Lancey to leave the house and pick up his (Zavada's) clothes.

As to affirmative acts of concealment, appellant either concealed or permitted Zavada to conceal: (1) the attache case full of bank loot in the bedroom dresser; (2) the wrappers around the bank money; (3) the laundry bag; (4) the traveler's checks in the camera box in the garage; (5) the demand note used in the hold-up; (6) a loaded gun in the bedstand; (7) the license plates in a paper sack in the garage.

Appellant also had the opportunity to advise the civil authorities after receiving Zavada's first telephone call and prior to his fruitless attempt to meet Zavada; after he drove Zavada to the Prunecrest address after the robbery; when he sent Al Salciccia to pick up Zavada's clothing; when he sent his wife to take Zavada to a tailor.

[5] Without referring to appellant's aid to Zavada prior to the crime (which permitted Zavada to rent two apartments —one under an assumed name, with Lancey paying the utilities), we find clear and substantial evidence that Lancey was proved to have knowledge of the crime, and the identity of the perpetrator; that he failed to notify the civil authorities when he had opportunity to do so; and that he did take affirmative action to conceal the crime and the perpetrator thereof.

## II—*Evidentiary Error*

■ A witness was asked about a telephone conversation with his brother which took place with no other person present in a telephone booth. It may have been inadmissible as incompetent, irrelevant, immaterial, not the best evidence, or even self-serving, but it was not hearsay—the only ground urged for the objection (R.T. pp. 65-67).

cooperate in regard to Zavada and led the agents about the house, pointing out Zavada's things.

He then showed the agents where the travelers checks taken from the bank were. They were in an Argus Camera box, as were the "robbery demand note", money wrappers, and the laundry bag in which Zavada carried the money. The box was among a quantity of equipment in the garage. Lancey also pointed out the license plates taken off the Chevrolet used by Zavada in the bank robbery. They were in a paper bag on a shelf in the garage. Lancey told the FBI Zavada had stolen the Chevrolet a few weeks ago in San Francisco. He told the agents that Zavada had six more sticks of dynamite, possibly a shotgun and a telephone book with coded numbers of Zavada's friends in an apartment in Sacramento located at 3401 Balmoral Drive.

He admitted Zavada had paid him $100, and gave him five $20 bills "to pay for some rent," but claimed he paid Zavada back.

During the afternoon a tailor had been selected and Mrs. Marshall had driven Zavada to the tailor's to get clothing and have a fitting. When Zavada returned, Zavada told Lancey that the tailor had felt Zavada's gun and Zavada told the tailor he was a postal inspector. Lancey said Zavada seemed unnerved and upset with the incident. When Zavada asked Lancey to go pick up the clothes for him, Lancey got Al Salciccia to do so instead. Lancey was afraid Zavada was setting him up; he felt Zavada did not trust him.

While Lancey claimed he was thinking of turning Zavada in, he did not do so, and he and Zavada, at one point, discussed what would be done if the FBI attempted to apprehend Zavada:

"Well, it was Mr. Marshall's statement that Zavada had stated that they, Mr. Marshall and himself, were going to shoot it out with the FBI, and that Mr. Marshall's family should take cover, as I recall it, in the bedroom. Now, these were Mr. Zavada's instructions to Mr. Marshall and not Mr. Marshall's desire, according to his statement."

(Appellee's Brief, pp. 8–13, modified slightly, and without references to the Record.)

When asked what he had said over the telephone, the witness answered:

"I don't know. I just said there was some kind of trouble and Tom should get over to the Marshall's right away." (R.T. p. 69)

If error, it was harmless. (Fed.R. Crim. 52(a).)

### III—*Alleged Husband and Wife Testimony*

Appellant urges that the only evidence he did not inform the authorities as soon as possible was the testimony of Melba Marshall—an alleged violation of privileged communication between husband and wife.

This simply is not correct. While Melba Marshall may have been the only witness to tell about her trip to the tailor with Zavada, there were other opportunities for appellant to act, though that may have been the best one.

But the true marital status of Lancey and Melba Marshall is in dispute..

To disprove the validity of the marriage, the government called one Patricia Ragan, who testified she married appellant in Las Vegas, Nevada, on October 7, 1961 (Ex. 17). This was prior to Lancey's marriage to Melba. There is no evidence in the record of a judicial dissolution of the Lancey-Ragan marriage. When Melba first married Lancey, she was not finally divorced from her previous husband, but Lancey and Melba married a second time after her divorce became final, just before the trial. This made her eligible to marry, but not Lancey.

Appellant then proved that Patricia Ragan had lived with another man as husband and wife in Texas for some four or five months prior to her marriage to Lancey, and had obtained no divorce from her alleged Texas common-law "husband," although she never considered herself married to him (C.T. pp. 141–43).

■ But appellant did not prove enough from Patricia Ragan to establish a prima facie or even a tentative common-law marriage in Texas.

"What elements, then, need be shown to make a prima facie or tentative showing of a common law marriage? In Texas, three elements must exist: (1) an agreement to be husband and wife; (2) living together as husband and wife; and (3) a holding out to the public that the couple are husband and wife." (Ex Parte Threet, 160 Tex. 482, 333 S.W.2d 361, 364 (1960).)

Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1 (1913); Shelton v. Belknap, 155 Tex. 37, 282 S.W.2d 682 (1955), and see cases cited in n. 4 in Ex Parte Threet, supra. Cf. Bobbitt v. Bobbitt, Tex.Civ.App., 223 S.W. 478 (1920). We note the rule in Michigan and Texas is much more strict than that in many states. Cf. Lefkoff v. Sicro, 189 Ga. 554, 6 S.E.2d 687, 133 A.L.R. 738(1939), and note; 23 Iowa L.Rev. 75 (1937). There was here proof of the fact of living as husband and wife; but no proof of the first and third essentials; an *agreement* and a *public showing*.

■ We uphold the action of the trial court in holding the invalidity of the Lancey-Ragan marriage had not been established because of a lack of proof of the creation of a Texas common-law marriage on the part of Patricia Ragan.

### IV—*Grand Jury Testimony*

■ This alleged error was the refusal of the trial judge to order the government to produce for appellant's counsel's inspection the grand jury testimony of one Al Salciccia.

Appellant concedes he was not entitled to this order as a matter of right under the Jencks Act, 18 U.S.C. § 3500. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed. 1323 (1959).

The trial court demonstrated it knew the law, and exercised the discretion the law gives it. (R.T. pp. 288–320) "No compelling need" was demonstrated why appellant's counsel should ascertain the grand jury testimony of a witness friend-

ly to his client. U. S. Industries, Inc. v. United States District Court, 345 F.2d 18 (9th Cir. 1965).

We find no error. The judgment of conviction is *affirmed*.