LYNCH, Circuit Judge.
Former Puerto Rico police officer Osvaldo Caraballo-Rodriguez (Caraballo) seeks on appeal to withdraw his plea of guilty to the crime of misprision of felony, 18 U.S.C. § 4. The plea was entered as part of a plea bargain under which much more serious drug conspiracy charges were dismissed. In order to withdraw his plea, Caraballo must, as he admits, meet the plain error standard of showing that, on the facts charged, no crime of misprision could be stated, that this error was plain at the time, that his substantial rights were affected (including that he would otherwise not have entered the plea agreement), and that the error implicated the fairness, integrity, or public reputation of judicial proceedings. This is a daunting task, and Caraballo does not accomplish it.
*64 The prosecution’s allegations were that Caraballo committed misprision by concealing and failing to report- an underlying drug crime in which he was involved (1) when he gave accurate information in an anonymous tip to the Drug Enforcement Administration (DEA) about the crime, but refused to provide additional requested information, and (2) when he refused to provide additional information despite his duty as a Puerto Rico police officer to disclose crimes.
Caraballo makes a serious argument that this court should adopt an interpretation of the misprision statute, as many circuits have done, which requires that there be an affirmative act of concealment, and hold that the facts in this case cannot sustain such a conviction. We do not rule on that question because even if there were error, it is not plain, and Caraballo has not shown either that his substantial rights were affected or that entry of this plea undermined the integrity of the proceedings or constituted a miscarriage of justice.
I.
In a sting investigation in 2000-2001 named “Honor Perdido” or “Lost Honor,” the FBI uncovered, and then the United States successfully prosecuted, a number of corrupt Puerto Rican police officers who assisted in the transportation and protection of illegal drugs in exchange for money. See United States v. Sánchez-Berríos, 424 F.3d 65, 71-72 (1st Cir.2005); United States v. Villafane-Jimenez, 410 F.3d 74, 78 (1st Cir.2005); United States v. Vázquez-Guqdalupe, 407 F.3d 492, 494 (1st Cir.2005); United States v. FlechaMaldonado, 373 F.3d 170, 172-73 (1st Cir.2004).
One of the officers netted was Caraballo. He was indicted and arrested in August 2001 in Cr. No. 01-613 for providing armed protection for a successful drug transport of more than five kilograms of cocaine. A second superseding indictment named sixteen defendants in total, charging Caraballo and others -with (1) conspiracy to knowingly and intentionally possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846; (2) attempt to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846; and (3) aiding and abetting in knowingly carrying firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(l)(A)(i). There was also a forfeiture count against all sixteen defendants under 21 U.S.C. § 853.
The second superseding indictment charged that the conspirators “use[d] their official positions as law enforcement officers and ... use[d] official government vehicles in order to ensure that no law enforcement agency or competing drug organizations would attempt to stop the vehicle in which the cocaine was concealed and seize the same.” It also alleged that the defendants “possessed] and carried] firearms in order to protect the shipments of multiple kilogram[s] of purported cocaine.” If convicted on the drug conspiracy or attempt charge, Caraballo faced a statutory minimum of ten years of imprisonment. 21 U.S.C. §§ 841(b)(1)(A), 846. Defendant faced at least an additional five years if convicted of the firearms charge. 18 U.S.C. § 924(c)(1)(A)®.
Although Caraballo agreed to help protect a drug transport, he took some unusual steps. He first partially tipped the DEA to the existence of the drug conspiracy. He then personally participated in the conspiracy. And he later met with the DEA to offer information and confess. Specifically, on May 24, the day before he assisted with the transfer of some ten kilograms of what was purported to be co *65 caine, he placed an anonymous call to the DEA. Caraballo indicated that he had information about police officers involved in drug trafficking, and stated that he had been approached by a female officer about participating in a drug smuggling operation. On questioning from DEA agents, he refused to give information that might identify himself or his co-conspirators, or to furnish specific information about the plot. He withheld information he knew about the drug transport that might have enabled the federal agents to interrupt the conspiracy. In truth, since this was a sting operation, the DEA had no desire to interrupt the conspiracy.
Close to two weeks after participating in the May 25 drug transport, on June 8, Caraballo contacted the DEA again, indicating that he wanted to provide information about police corruption and drug trafficking. Later that day, Caraballo met with two federal agents and described the transport of drugs that took place two weeks earlier. Caraballo provided names of co-conspirators, admitted his own participation in the drug transport, and stated that he received $4,000 for his efforts. Caraballo agreed to cooperate with the FBI. The record does not establish whether he made full disclosure. It is clear that his later disclosure to authorities was not made as soon as possible after he had knowledge of the crime. Despite his cooperation in June, Caraballo was still indicted in August.
After he was charged, Caraballo, represented by counsel, negotiated a plea agreement with the prosecution. He received a number of benefits. The government agreed to a new charge, brought under 18 U.S.C. § 4, of misprision of felony, to which Caraballo agreed to waive indictment and plead guilty. This was a considerably less significant charge than the drug conspiracy, attempt, and firearms charges.
There was another benefit to Caraballo as well. For the limited purpose of the plea agreement, the parties stipulated that Caraballo would be held accountable for having knowledge of, and concealing, the underlying felony of conspiracy to distribute at least 400 grams but less than 500 grams of cocaine. Under the earlier drug conspiracy indictment, Caraballo had been charged with being accountable for more than five kilograms of cocaine, not a mere 400 to 500 grams.
And there were other benefits to Cara-ballo. The parties also agreed that they would jointly recommend a sentence of imprisonment equivalent to the time Cara-ballo spent in pre-trial' detention. Upon imposition of sentence, the United States agreed to move to dismiss the charges pending against defendant in Cr. No. 01-613. The agreement, signed on December 4, 2002 by Caraballo, who was represented by counsel, acknowledged that “he is pleading guilty freely and voluntarily because he is in fact guilty [of the crime of misprision].”
II.
The misprision information, filed in Cr. No. 02-463 on the same day that defendant signed the plea agreement, alleged that Caraballo had knowledge of a conspiracy to distribute cocaine but “did conceal the same by withholding information and the identities of conspirators in communications with federal law enforcement agents, and did not as soon as possible make known the conspiracy to some ... authority.” On the misprision charge, Caraballo’s maximum term of imprisonment was three years, his maximum fine was $250,000, and the maximum term of supervised release was one year.
*66 The plea agreement contained a signed stipulation of facts, as follows:
1. In November 2000, Arturo Ortiz-Colon, a former police officer cooperating with government investigators, told DIANA DIAZ-CRISPIN, then a police officer of the Puerto Rico Police Department, that a Colombian drug trafficker referred to as “El Viejo” sought to hire police officers to escort and protect multiple kilogram shipments of cocaine. DIANA DIAZ-CRISPIN agreed to escort and protect the cocaine shipments, and additionally agreed to recruit other police officers to escort shipments of cocaine.
2. In May 2001, ... DIANA DIAZ-CRISPIN invited OSVALDO CARA-BALLO-RODRIGUEZ to assist in [the] transportation and protection of a cocaine shipment. DIANA DIAZ-CRIS-PIN and Arturo Ortiz Colon informed OSVALDO CARABALLO-RODRI-GUEZ of the plan to escort a shipment of cocaine.
3. Although a police officer, OSVALDO CARABALLO-RODRIGUEZ did not timely report the conspiracy to distribute cocaine to other police officers. Although OSVALDO CARABALLO-RODRIGUEZ spoke with agents of the Drug Enforcement Administration prior to the transport of the purported cocaine, he did so anonymously and withheld information that might have enabled the federal agents to interrupt the conspiracy. More specifically, when agents asked OSVALDO CARABAL-LO-RODRIGUEZ for information regarding the conspiracy, OSVALDO CARABALLO-RODRIGUEZ at that time declined to identify the conspirators or to furnish specific information • regarding their plot.
■ 4. On May 25, 2001, DIANA DIAZ-CRISPIN and other members of her conspiracy successfully transported packages purported to contain cocaine from one point to another point in Puer-to Rico.
With Caraballo’s consent, his plea was entered on December 4, 2004 before a magistrate judge who followed the usual procedural requirements under Federal Rule of Criminal Procedure 11. During the colloquy, the following exchange took place:
THE COURT: And the charge says, generally, that you concealed the same by withholding information and the identities of the conspirators in communications with federal law enforcement agents and you did not as soon as possible make known the conspiracy to some Judge or other person in a civil or a military authority under the United States.
Do you understand that?
THE WITNESS: Yes, sir.
THE COURT: And that’s the charge that you’re pleading guilty to, is that correct?
THE WITNESS: Yes, sir.
There is no doubt that the government made explicit its theory of what constituted both the underlying felony and the misprision charge.
As for the factual basis for the plea, the government began its recitation of the facts at the plea hearing by noting that “the evidence to prove the information in this case is closely tied to the evidence in Criminal Case 0[1]-0613,”[1] which was be *67 fore the same district judge. The government continued:
[I]f we’d gone to trial the United States would have presented testimony and audio and video recordings to show that in November of 2000 a cooperating witness by the name of Arturo Ortiz Colon contacted a police officer, Diana Diaz Crispin, and offered her a job on behalf of the Colombian drug trafficker known as “El Viejo[,”] escorting and protecting cocaine shipments.
Diana Diaz agreed to do this and also agreed to recruit other police officers.
In May 2001 Diana Diaz Crispin invited this Defendant Osvaldo Caraballo Rodriguez to assist in the transportation and protection of the cocaine shipment.
She further informed this Defendant, as well as Arturo Ortiz Colon informing this Defendant, as well as the details of the plan to escort a ' shipment of the cocaine.
Although he was a police officer at the time[,] this Defendant did not timely report this conspiracy to any other police officers or the Puerto Rico Police Department.
What’s more, although he spoke with the agents of the Drug Enforcement Administration prior to the transport of the purported cocaine, that is on May 24, he did so anonymously and with no information that would have enabled the federal agents to interrupt the conspiracy-
Specifically, when the agents asked him for information regarding the conspiracy that might identify the Defendant or his co-conspirators or the conspirators in the case[,] he declined to furnish the specific information regarding the plot at that time.
Thus, [o]n May 25, 2001 Diana Diaz Crispin and other members of the conspiracy successfully transported packages purported to contain cocaine from one point to another’ in Puerto Rico.
Notably, the prosecutor referred to “Defendant or his co-conspirators,” making clear that the government believed it had evidence to prove beyond a reasonable doubt that Caraballo had at some point joined the conspiracy. The prosecutor also stated that the drug conspirators successfully transported packages' purported to contain cocaine from one point to another in Puerto Rico. Caraballo agreed with this recitation of the facts:
THE COURT: Mr. Caraballo, did you listen to what the Prosecutor said?
THE WITNESS: Yes, sir.
THE COURT: Do you agree with his statement?
THE WITNESS: Yes, sir.
THE COURT: Is there anything in that statement that you disagree with?
THE WITNESS: No, sir.
THE COURT: Do you still wish to plead guilty?
THE WITNESS: Yes, sir.
The transcript of the plea hearing makes clear that, as to the underlying drug conspiracy, Caraballo agreed that he had been a conspirator.[2]
*68 The magistrate judge found defendant’s plea to the misprision charge to be knowing and voluntary, accepted the plea, and made a report and recommendation to the district court on December 6, 2002. Cara-ballo filed no objection with the district court.
On April 30, 2003, Caraballo appeared before the district court for sentencing. The court accepted the parties’ recommendation and imposed a sentence of time served. Caraballo was arrested on August 14, 2001 and remained in prison until December 4, 2002, when he was released on his personal recognizance. No fine was imposed beyond the required special monetary assessment of $100.
On May 6, 2003, Caraballo appealed from the judgment of conviction and his sentence. His appellate counsel initially filed an Anders brief, which this court rejected. See Anders v. California,. 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). We directed counsel to brief the issue of whether there was a factual basis for Caraballo’s plea as to each element of the offense charged under 18 U.S.C. § 4, and in particular whether a failure to make full disclosure constitutes an act of concealment under the misprision statute. We directed counsel’s attention to United States v. Cefalu, 85 F.3d 964 (2d Cir.1996); United States v. Warters, 885 F.2d 1266, 1274 (5th Cir.1989); and United States v. Ciambrone, 750 F.2d 1416, 1418 (9th Cir.1985). On the further submission of an Anders brief, we permitted Caraballo’s counsel to withdraw and appointed new counsel, who has briefed this appeal.[3]
III.
The essence of Caraballo’s claim is that he pled guilty to activities which do not constitute the crime of misprision and so *69 his plea must be yacated. See United States v. Johnson, 546 F.2d 1225, 1227 (5th Cir.1977) (reversing conviction under 18 U.S.C. § 4 by guilty plea on preserved claim where factual basis for plea showed mere failure to report a felony and court held this did not constitute misprision). He also characterizes the district court as having affirmatively misstated an element of the offense at the plea colloquy in violation of Federal Rule of Criminal Procedure 11. See United States v. Gandia-Maysonet, 227 F.3d 1, 3-5 (1st Cir.2000).[4]
Rule 11 requires a court to determine that there is a factual basis for a plea before entering judgment. Fed.R.Crim.P. 11(b)(3). Rule 11 also requires a court to ensure that a defendant understands the nature of each charge to which he pleads guilty. Fed.R.Crim.P. 11(b)(1)(G). There was certainly a factual basis for the plea on the government’s theory. The question is rather whether the government’s theory, which was explained to Caraballo at the plea colloquy, permissibly stated an offense under 18 U.S.C. § 4.
A. Standard of Review
Caraballo failed to call the district court’s attention to the alleged lack of a factual basis for the plea, or to present to the district court the legal arguments now asserted. Caraballo also never moved to withdraw his plea.
As a result, our review is for plain error. United States v. Vonn, 535 U.S. 55, 58-59, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002); United States v. Negrón-Narváez, 403 F.3d 33, 37 (1st Cir.2005).[5] “To establish plain error, a defendant must demonstrate that: (1) there was error; (2) the error was plain; (3) the error affected the defendant’s substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings.” United States v. Riggs, 287 F.3d 221, 224 (1st Cir.2002) (citing United States v. Olano, 507 U.S. 725, 732-36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United States v. Saxena, 229 F.3d 1, 5 (1st Cir.2000)); see also United States v. Ramirez-Benitez, 292 F.3d 22, 27 (1st Cir.2002). The burden is on the defendant to establish each element of plain error.
In applying plain error analysis in guilty plea cases, a defendant must, in order to demonstrate that his substantial rights were affected, “show a reasonable probability that, but for the error, he would not have entered the [guilty] plea.” United States v. Dominguez Benitez, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004); see also United States v. Delgado-Hernandez, 420 F.3d 16, 20 (1st Cir.2005) (applying plain error analysis where defendant argued there was no factual basis to support his guilty plea). “A defen *70 dant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding.” Dominguez Benitez, 542 U.S. at 83, 124 S.Ct. 2333 (internal quotation marks omitted).
B. Misprision of Felony — Was There Plain Error?
The prosecution has articulated the elements of the offense as follows:
In the instant case, the offense of conviction, misprision of felony, requires proof that: “1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime.”
See Cefalu, 85 F.3d at 969 (citing Ciambrone, 750 F.2d at 1417; United States v. Baez, 732 F.2d 780, 782 (10th Cir.1984)). Caraballo has not materially contested this formulation, and we accept it arguendo.
This is an unusual case in that Caraballo had several overlapping roles. First, he had full knowledge, both before and after, of a crime. Second, he was a participant in that crime and not a mere witness. Third, although he did initially notify authorities, he did not provide authorities with his full knowledge of the drug conspiracy despite requests that he do so. Fourth, he was not a mere member of the public but was a police officer. Each of these roles factors into the analysis.
Applying the plain error test, we. ask whether Caraballo’s proposed construction — that a partial truthful disclosure cannot be an affirmative act and an affirmative act is required — is compelled by the language of the statute itself, construction of the statute in light of the common law, or binding judicial construction of the statute. We hold that Caraballo has not met his burden of showing there was an error which was plain, for several basic reasons. In doing so, we do not make any ruling on the merits of the issues discussed under the misprision statute.
First, while this court and the Supreme Court may someday adopt the majority rule in the circuits that an affirmative act is required for a misprision offense, there is now no binding precedent to that effect. Caraballo does not argue otherwise. None of our misprision cases has adopted Caraballo’s proposed rule. Further, in United States v. Vazquez-Alomar, 342 F.3d 1, 2 (1st Cir.2003), we suggested that a federal prisoner had violated 18 U.S.C. § 4 when he did not inform federal authorities that he had engaged in telephone conversations with others about crimes. Consequently, there can be no plain error. Thus, we need not resolve the greyer areas of what constitutes an affirmative act. Secondly, we cannot say there is plain error because the government articulates a new theory, not accepted, but not rejected by any court, based on Caraballo’s obligations as a police officer. The theory has some support at English common law.
Caraballo’s argument that there was plain error is not proven by the language of the statute itself. Misprision of felony is defined at 18 U.S.C. § 4:
Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.
The underlying felony in this case was the drug conspiracy charged in Cr. No. 01-613. At issue is whether the facts alleged *71 satisfy the statutory terms “conceals and does not as soon as possible make known.”
The dictionary definitions of “conceal” and “concealment” do not prove Carabal-lo’s claim. The Oxford English Dictionary refers to both a common usage of keeping secret of any information and a legal usage of intentional suppression of truth. 3 Oxford English Dictionary 647 (2d ed.1989). Black’s Law Dictionary defines the primary meaning of “concealment” as “[t]he act of refraining from disclosure[, especially] an act by which one prevents or hinders the discovery of something.” Black’s Law Dictionary 306 (8th ed.2004). Neither source compels only one reading of the term “conceals” in 18 U.S.C. § 4.
Nor does the common law background of the statute compel Caraballo’s reading. The statute at issue, derives from a common law offense. Misprision of felony was a crime under English common law, dating back centuries. Sykes v. Dir. Pub. Prosecutions, [1962] A.C. 528, 555 (H.L.) (U.K.) (stating that misprision of felony “has been an offence for the last 700 years or more,” though not always under that name); C.W. Mullís, Comment, Misprision of Felony: A Reappraisal, 23 Emory L.J. 1095, 1095 (1974) (noting that “[t]he offense of failing to report a felony was first labeled ‘misprision’ by Sir William Staun[ ]ford in 1557”).
Congress, in 1790, enacted a federal misprision statute which is essentially the same as 18 U.S.C. § 4 today. See Act of Apr. 30, 1790, § 6, 1 Stat. 113. There are some differences, however, between the English common law doctrine and how the federal statute has been interpreted in the United States. See C.M. Curenton, Comment, The Past, Present, and Future of 18 U.S.C. § 4 An Exploration of the Federal Misprision of Felony Statute, 55 Ala. L.Rev. 183, 183-84, 186 (2003); Mullis, supra, at 1098-99, 1101-04.
At English common law, “[e]ver since the days of hue and cry, it [was] the duty of a man, who kn[ew] that a felony ha[d] been committed, to report it to the proper authority so that steps [could] be taken to apprehend the felon and bring him to justice.” Sykes, [1962] A.C. at 555. Accordingly, Staunford in 1557 defined misprision as follows: “Misprision ... is properly when anyone learns or knows that another has committed treason or felony, and he does not choose to denounce him to the King or to his Council, or to any magistrate, but conceals his offense.” Id. at 557. In light of this history, Lord Denning of the House of Lords pronounced that a person accused of misprision of felony “need not have done anything active: but it is his duty by law to disclose to proper authority all material facts known to him relative to the offence.” Id. at 563. Lord Guest, for his part, observed that he could not find in the “numerous institutional writers who have defined [misprision of felony] ... any statement that active steps of concealment are required to constitute the offence.” Id. at 572.
Nor has the Supreme Court adopted Caraballo’s reading. The Court, in Roberts v. United States, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980),[6] discussed the obligations of citizens not to conceal crimes, first as a matter of com *72 mon law and then as defined and enforced through 18 U.S.C. § 4. As Roberts stated:
Concealment of crime has been condemned throughout our history. The citizen’s duty to “raise the ‘hue and erf and report felonies to the authorities,” Branzburg v. Hayes, 408 U.S. 665, 696, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), was an established tenet of Anglo-Saxon law at least as early as the 13th century. 2 W. Holdsworth, History of English Law 101-102 (3d ed.1927); 4 id., at 521-522; see Statute of Westminster First, 3 Edw. 1, ch. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, chs. 1, 4, and 6, pp. 112-115 (1285). The first Congress of the United States exacted a statute imposing criminal penalties upon anyone who, “having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority....” Act of Apr. 30, 1790, § 6, 1 Stat. 113. Although the term “misprision of felony” now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.
445 U.S. at 557-58, 100 S.Ct. 1358 (alterations in original) (footnote omitted). Roberts made explicit that 18 U.S.C. § 4 can be applied where, as here, the witness to the crime is a participant himself in the underlying criminal activities, subject to Fifth Amendment concerns[7]:
This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself. Unless his silence is protected by the privilege against self-incrimination ..., the criminal defendant no less than any other citizen is obliged to assist the authorities.
Id. at 558, 100 S.Ct. 1358. Putting constitutional concerns aside momentarily, the statutory text applies to “whoever” meets its criteria, and does not necessarily exclude participants in crimes.[8]
*73 Still, in Caraballo’s favor is the fact that neither the common law crime nor the statute was meant to punish in every instance every person who knows of a crime but does not report it. In 1822, Chief Justice Marshall noted, “It may be the duty of a citizen to accuse every offender, and to proclaim every offense which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man.” Marburg v. Brooks, 20 U.S. (7 Wheat.) 556, 575-76, 5 L.Ed. 522 (1822). Further, it is clear that misprision of felony cannot be read so broadly as to “make a criminal of anyone who, as the victim of a crime or faced with a criminal threat, resisted a ... suggestion that the police be called.” United States v. Rakes, 136 F.3d 1, 5 (1st Cir.1998). The scope of the obligations imposed by the statute is an important issue in today’s society where police investigations are often hampered by codes of silence and fearful refusal by witnesses to cooperate. Those issues are beyond the scope of this opinion.
Rather, Caraballo’s argument turns on judicial construction of the statute; since we have not yet adopted the construction he urges, there is no plain error. However, we do not foreclose later adoption of such a construction. Caraballo particularly stresses the fact that many courts have interpreted the “conceals and does not as soon as possible make known” language as requiring an affirmative act of concealment. See, e.g., United States v. Goldberg, 862 F.2d 101, 104 (6th Cir.1988); United States v. Davila, 698 F.2d 715, 717 (5th Cir.1983); United States v. Sampol, 636 F.2d 621, 653 (D.C.Cir.1980); Daddano, 432 F.2d at 1124; Lancey v. United States, 356 F.2d 407, 410 (9th Cir.1966); Neal v. United States, 102 F.2d 643, 646 (8th Cir.1939); Bratton v. United States, 73 F.2d 795, 797-98 (10th Cir.1934) (citing United States v. Farrar, 38 F.2d 515, 517 (D.Mass.), aff'd on different grounds, 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930)).
Whether it is a proper construction of the statute to require an affirmative act of concealment has been questioned. Mullís, supra, at 1104 (“The possibility that such a requirement was originally intended by Congress is rather slim, since, by the date of the statute’s first enactment [in 1790], such a requirement had never before been applied to the crime. It is much more reasonable to conclude - that Congress intended ‘conceal and’ to signify a conscious and intentional non-disclosure.”).
Caraballo argues that, in any of his capacities, he did not conceal the drug conspiracy. Rather, he disclosed it, and his refusal to provide the additional requested information cannot be punished as an act of concealment.[9] Caraballo relies on a series of cases holding that mere silence does not qualify as an act of concealment. See Goldberg, 862 F.2d at 105-06; Johnson, 546 F.2d at 1227; Lancey, 356 F.2d at 410; Neal, 102 F.2d at 650; Bratton, 73 F.2d at 798. But mere silence cases do not necessarily help him. Caraballo did not remain merely silent. He affirmatively sought out federal agents to make partial disclosure, but then declined to provide requested information.
Caraballo places special emphasis on Ci-ambrone, a Ninth Circuit case. Ciam-brone is not a mere silence case, but a partial disclosure case. The defendant in Ciambrone truthfully, but only partially, *74 disclosed his knowledge about a counterfeiting operation to a Secret Service agent. 750 F.2d at 1417. The court held that partial disclosure could not constitute misprision because if some information were offered, there could be no greater concealment of the felony than if the defendant who had knowledge of the crime had said nothing. Id. at 1418. Ciambrone required an affirmative act and implicitly held that the act of coming forward to provide information, but refusing to answer other questions, does not qualify as an affirmative act of concealment. None of the other cases cited by Caraballo adopts Ciambrone’s position with respect to partial disclosures. Indeed, no federal court has followed Ciambrone in holding that a truthful, but partial, disclosure is insufficient to support a misprision conviction.
The Ciambrone logic, then, departs from the common law position that there is a general duty on citizens to disclose, and instead relies on a more limited rationale for the statute that misprision is concerned only with situations in which the government may be put in a worse situation or misled.
Caraballo admits that courts have sustained the application of the misprision statute in cases where someone with knowledge of a felony provided untruthful information. See Sampol, 636 F.2d at 656; cf. United States v. Salinas, 956 F.2d 80, 81 (5th Cir.1992). He distinguishes these cases on the facts here, on the basis that it is not alleged that he provided false information to federal agents.
There'may be instances in which even partial truthful disclosures can be misleading. Ciambrone assumes that the government may not be misled by receipt of truthful information, even if it is incomplete, 750 F.2d at 1418, but that is not necessarily so. For example, United States v. Sessions, Nos. 00-1756, 00-1791, 2000 WL 1456903 (8th Cir. Oct.2, 2000) (unpublished decision), held that the misprision statute was satisfied where the defendant “gave incomplete information to police regarding his knowledge of the [crime],” at least where he “gave the police partial information that was misleading.” Id. at *1, 2000 WL 1456903. If the statute is geared toward avoiding the misleading of police, Ciambrone, 750 F.2d at 1418, it is still possible, in concept and in fact, that even a truthful but partial disclosure could conceal by misleading the government through the withholding of key information.[10]
We cannot tell from the facts here whether the giving of partial information in this case in any way could have misled the* DEA — information against Caraballo alleged only that he withheld information and the identities of co-conspirators, and did not as soon as possible make the conspiracy known to the appropriate authorities. On plain error review, even under a modified Ciambrone approach, it is defendant’s burden to show that his truthful but partial disclosure was not misleading, and Caraballo has not done so.
*75 The government argues, as a second theory,[11] that even if there is a requirement for an affirmative misrepresentation from an ordinary citizen, Caraballo had higher duties as a police officer. This appears to present a novel interpretation of the statute. The prosecution’s theory derives from the obligations on police officers to disclose information about crimes, irrespective of whether civilians would have had such a duty. Caraballo was, at the time, a police officer who had an affirmative duty to act on information about a crime under Puerto Rican law. See P.R. Laws Ann. tit. 25, § 3102 (duty of the “Puerto Rico Police” is to “prevent, discover, investigate and persecute crime and, within the scope of its authority, enforce obedience of the laws”).
The prosecution argues that government officials, particularly police, who are already under an affirmative duty to report crimes, inherently conceal when they do not meet their duty to disclose. We have found no misprision cases discussing this theory.[12]
Nonetheless, the argument, in light of the theory of law under the misprision statute to which Caraballo pled guilty, cannot be said to be plainly erroneous. Roberts itself referred to “gross indifference to the duty to report” and thought pertinent the development of this duty in Anglo-Saxon law. Indeed, there is some historical support in common law misprision doctrine for imposing special responsibilities on public officials. In 1628, Lord Coke in his Third Institute noted that “the concealment of felonies in sheriffs, or bailiffs of liberties is more severely punished than in others.” Sykes, [1962] A.C. at 558 (internal quotation marks omitted). Professor Glazebrook, although arguing for a broader view of what constituted misprision under English common law, has recognized that the term “misprision” in the fourteenth and fifteenth centuries was thought “to have been ... especially appropriate to *76 the misconduct of public officers.” P.R. Glazebrook, Misprision of Felony — Shadow or Phantom?, 8 Am. J. Legal Hist. 189, 191, 194 (1964). As another commentator has noted, “In fact, a strong case can be made that misprision should have particular applicability to public officers. Even at common law, commission of misprision appears to have been especially culpable for public officers, since they received a higher penalty for the crime than that received by ordinary citizens.” Mullis, supra, at 1113 (citing W. Blackstone, 4 Commentaries 121). Because the theory is novel under the statute, it has neither been accepted nor rejected. The burden is on defendant to show that if there was any error, that error was plain. Ramirez-Benitez, 292 F.3d at 27.
This background buttresses our conclusion that if there was any error, it was not plain error. We stress that we do not, and need not, rule on the merits of issues pertaining to the judicial construction of the statute. The analysis could end here, but we comment briefly on the remaining prongs of the test.
C. Other Elements of Plain Error Test
Under the third prong, we must ask, as Caraballo has framed the issue of the voluntariness of the plea,[13] whether there is a reasonable probability that, but for the alleged error, Caraballo would have decided not to plead guilty. See Dominguez Benitez, 542 U.S. at 83, 124 S.Ct. 2333. We do so by looking at the entire record, and not just at what was directly before the district court during the plea hearing. Delgado-Hernandez, 420 F.3d at 28-32. In this case, the plea was entirely voluntary, and- defendant was fairly apprised of both the law and the facts. See United States v. Cruz-Rivera, 357 F.3d 10, 13 (1st Cir.2004) (holding defendant to guilty plea on plain error standard of review). Caraballo chose to plead guilty as part of an extremely favorable plea deal he and his counsel worked out with the government. He also chose to cooperate, and he admitted to participation in the drug conspiracy, for which he received a benefit. At his plea colloquy, Caraballo agreed with the prosecutor’s statement that he was a “conspirator,” an obvious reference to the drug conspiracy. Caraballo’s deal was thus specifically structured to find a significantly less serious offense to which he could plead, and one which would permit him to avoid any imprisonment beyond the time already served. As Caraballo’s own counsel stated at sentencing: “Initially [Caraballo] was tempted by the ... economic gain that pervades the drug traffic, and he wavered.... But he took certain steps afterwards ... and [the prosecutor] was wise enough and interested enough in justice that he reviewed that, and we came up with [this plea bargain].” Thus, even if the district court had erred in its understanding of misprision law, there is nothing in the record to suggest that the defendant would have been willing to risk trial on the conspiracy charges in the absence of the error. See United States v. Matos-Qui *77 ñones, 456 F.3d 14, 23 (1st Cir.2006). Car-aballo’s substantial rights were not affected.
Under the fourth prong, we ask whether the plea arrangement calls into question the integrity of the judicial process. This case does not present the sort of miscarriage of justice for which plain error is reserved. United States v. Savinon-Acosta, 232 F.3d 265, 269 (1st Cir.2000). Cara-ballo, who participated in a major drug conspiracy, had his cooperation generously rewarded. He was sentenced to time served of less than sixteen months. If convicted of the original drug conspiracy or attempt charge involving more than five kilograms of cocaine, he faced a minimum sentence of “not ... less than 10 years” under 21 U.S.C. §§ 841(b)(1)(A) and 846. If convicted of the original firearms charge, he faced an additional five years of imprisonment or more under 18 U.S.C. § 924(c)(1)(A)®. Other officers who were convicted in this same conspiracy received lengthy terms of imprisonment on the order of twenty years. Sánchez-Berríos, 424 F.3d at 73; Villafane-Jimenez, 410 F.3d at 78; Vázquez-Guadalupe, 407 F.3d at 495; Flechar-Maldonado, 373 F.3d at 174. Whether or not the lesser charge of misprision constituted, on these facts, a viable theory of criminal liability, Caraballo, who was advised by counsel, not surprisingly agreed to plead guilty to that theory.

Affirmed.

. Although the prosecutor cited Cr. No. 00-0613, it is clear that he meant to refer to Cr. No. 01-613.

. Caraballo has moved to strike the government's supplemental appendix, which contains FBI interview notes relating to Cara-ballo's participation in the underlying drug offense. The notes contain admissions from Caraballo that he participated in the conspiracy. Since he already agreed with the prosecutor’s recitation of facts at the plea colloquy, it is unclear what the motion to strike on appeal is intended to accomplish.
Caraballo wrongly argues that the papers are outside of the record because they appeared first in the record of the underlying drug case, Cr. No. 01-613. Under Federal Rule of Appellate Procedure: 10(a)(1), the record consists of "the original papers and ex *68 hibits filed in the district court.” But the interview notes were also on file in this misprision case. The notes independently appear in the file for this case, stapled to Caraballo’s plea agreement, and thus they appear to have been filed in Cr. No. 02-463 under docket number 3. Indeed, that docket entry is described by the district court as "Plea Agreement with government’s version of the facts attached.” The record in this case as transmitted by the district court on appeal did in fact contain the documents, contrary to the dissent. Further, Caraballo himself submitted these same interview notes to this court in a pro se brief he filed in this case.
Even if the notes had not been filed in Cr. No. 02-463, the notes were clearly filed in the related proceeding, Cr. No. 01-613, and both cases proceeded before the same district judge. That means-that the district judge who accepted Caraballo’s guilty plea and sentenced him had these interview notes in the case files. The cases are so intertwined that the sentencing transcript in Cr. No. 02-463 contains the government's formal dismissal of all charges in Cr. No. 01-613. Accordingly, even if the interview notes had only been filed in Cr. No. 01-613, we would deem them as within the scope of Rule 10. Cf. United States v. Canada, 960 F.2d 263, 267-68 (1st Cir.1992) (holding that sentencing court may rely on information derived from a co-defendant’s trial before the same judge).
Further, the district court has now supplemented the record and certified that the interview notes are part of the record on this appeal. The clerk of the district court certified that the transmitted documents "constitute the supplemental record on appeal in the case,” clearly referring to Cr. No. 02-463.
Caraballo’s other ground for striking the appendix is that the interview notes are not admissible under the rules of evidence. But there is no requirement, under Federal Rule of Appellate Procedure 10, that a document must be admissible in evidence to be part of the record on appeal. Nor is a sentencing court bound by the rules of evidence. United States v. Green, 426 F.3d 64, 66 (1st Cir.2005).

. Further, Caraballo attempts to color his claim as raising constitutional due process concerns.

. To the extent defendant argues that the asserted error involves structural error, invoking a more demanding standard of review, we reject any such claim. See Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (explaining that structural error involves a “structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself”); United. States v. Padilla, 415 F.3d 211, 219 (1st Cir.2005) (en banc) (noting that “[t]he category of structural error has been reserved for a very limited class of cases” involving "only the most pervasive and debilitating errors,” such as “a total withholding of the right to counsel at trial,” "a denial of the right of self-representation at trial,” or "the specter of a biased judge presiding over a case” (citations and internal quotation marks omitted)). Here, defendant has not alleged an error affecting the "entire conduct of the trial from beginning to end.” Fulminante, 499 U.S. at 309, 111 S.Ct. 1246.

. Roberts dealt with the analogous question of whether a sentencing court could take into account the fact that a defendant only partially cooperated with the police investigation. The defendant provided information about drug transactions and explained the meaning of certain code words, but gave evasive answers when asked to name suppliers. 445 U.S. at 554, 100 S.Ct. 1358. Roberts, in a pre-guidelines era, held that the judge could properly take the defendant's lack of full cooperation into account at sentencing. Id. at 561-62.

. Where the person with knowledge of an underlying crime is also involved in the crime, there are tensions between the Fifth Amendment privilege against self-incrimination and the statutory obligation to provide disclosure. See, e.g., United States v. King, 402 F.2d 694, 697 (9th Cir.1968); see also United States v. Kuh, 541 F.2d 672, 677 (7th Cir.1976) ("If the duty to notify federal authorities is precluded by constitutional privilege, it is difficult to understand how a conviction [under 18 U.S.C. § 4] could be substantiated.”). But see United States v. Daddano, 432 F.2d 1119, 1125, 1129 (7th Cir.1970) (discussing argument that the misprision statute could not be applied to defendants because of Fifth Amendment privilege, but ultimately affirming convictions). Caraballo has not argued there are any Fifth Amendment privilege issues in this appeal. Caraballo has not established that he was entitled to assert any Fifth Amendment privilege at the time of his initial tip. The record established only that he knew of the conspiracy, and does not establish that he had in fact agreed to participate in the conspiracy. He waived any privilege as of the time he disclosed to the police after he participated in the crime. Nor does Caraballo argue that the Fifth Amendment shielded him from application of the statute.
The privilege may be waived, as Caraballo has done, thus permitting plea bargains of this sort.
It may also be that the statute is curtailed by common law privileges, such as the attorney-client privilege or spousal immunity. See Mullís, supra, at 1099, 1110; see also Sykes, [1962] A.C. at 564 (dismissing claim that "the offence of misprision is impossibly wide,” reasoning that "[n]on-disclosüre may sometimes be justified or excused on the ground of privilege,” such as that between attorneys and clients or between doctors and patients). None of those common law privileges is involved here.

. In Branzburg v. Hayes, 408 U.S. 665, 696 n. 36, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court also noted that some lower courts had construed the statute to require both knowledge of a crime and an affirmative *73 act of concealment or participation, but the Court did not adopt that construction.

. In most cases, it is irrelevant whether the government had other knowledge of the crime, as it apparently did here. Lancey, 356 F.2d at 409-10.

. This concept is commonly accepted in other areas of law. See United States v. Nelson-Rodriguez, 319 F.3d 12, 33 (1st Cir.2003) (recognizing that omitted facts in a wiretap warrant affidavit may mislead); United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir.1996) (commenting that a “bare-bones description” submitted to judge may have been "calculated to mislead”); United States v. Stanert, 762 F.2d 775, 781 (9th Cir.1985) (holding that omitted facts in a warrant affidavit may mislead); United States v. Previte, 648 F.2d 73, 85 (1st Cir.1981) (noting that trial court’s use of slide transparencies to deliver jury instructions "had some potential to mislead the jury, more by what they omitted than by what they contained”).

. At oral argument, but not in its brief, the government presented an additional argument — that the "concealment” consisted of defendant’s actions during the underlying drug crime when, by providing a police escort, he tried to make it appear that the transport of the drugs was legitimate. See United States v. Gravitti 590 F.2d 123, 125-26 (5th Cir.1979) (defendant transported robbers in his car to where stolen money was stashed and then returned to his apartment where money was divided); see also Lancey, 356 F.2d at 410-11 (defendant either himself concealed or allowed bank robber to' conceal numerous items related to robbery). That was not the theory on which the plea was accepted. On the other hand, had Caraballo raised questions before the district court about the legitimacy of the government’s misprision theory, the government might have filed a new or amended information raising this alternate theory of concealment.

. Of the multiple misprision cases Caraballo cites in his brief, only two involve defendants who were police officers. In neither case, apparently, was this argument .made. The defendant in Bratton was a peace officer who apprehended someone feloniously possessing alcohol. 73 F.2d at 796 n. 1, 797. The officer released the offender upon a promise of being paid a bribe, most of which was in fact paid. Id. at 796 n. 1. The Tenth Circuit, in 1934, reversed the conviction, finding no act of concealment. Id. at 798-99. The court did not, however, consider the import of Brat-ton's status as an officer. Id.
In Daddano, one of the defendants was the Chief Investigator of the Special Investigations Unit for the county sheriff's department. 432 F.2d at 1122. The Seventh Circuit held that the jury could properly infer from the evidence that the officer had arranged to have lie detector tests administered to a group of bank robbers, at the request of a crime boss. Id. at 1122-23. The court held that the administration of the lie detector tests constituted an affirmative act of concealment. Id. at 1124-25. But, as in Bratton, the court did not consider whether the defendant’s occupation as a police officer imposed special duties. Id. at 1123-25.

. Caraballo has not argued more generally that he can show "that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding.” Dominguez Benitez, 542 U.S. at 83, 124 S.Ct. 2333 (internal quotation marks omitted). He has waived any other argument based on the adequacy of the facts recited. Even if the issue had not been waived, as it has been, it is without merit. The facts presented with the plea reasonably constituted a basis on which the court could accept the plea. See United States v. Matos-Quiñones, 456 F.3d 14, 21 (1st Cir.2006). Further, even if this court were to adopt some sort of affirmative misrepresentation requirement, Caraballo has not shown that his only partial disclosures were not affirmative acts and did not have some misleading effect.